No. 24-1450

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

STAFFING SERVICES ASSOCIATION OF
ILLINOIS, AMERICAN STAFFING
ASSOCIATION, CLEARSTAFF INC.,
M.M.D. INC. d/b/a TheAllStaff Group, Inc.,
and TEMPSNOW EMPLOYMENT AND
PLACEMENT SERVICES LLC,

        Plaintiffs-Appellees,

    v.

JANE R. FLANAGAN, in her official
capacity as the Director of the Illinois
Department of Labor,

        Defendant-Appellant.

Appeal from the United States
District Court for the Northern
District of Illinois, Eastern
Division

No. 1:23-cv-16208

The Honorable
THOMAS M. DURKIN,
Judge Presiding.

**BRIEF AND SHORT APPENDIX OF DEFENDANT-APPELLANT
THE DIRECTOR OF THE ILLINOIS DEPARTMENT OF LABOR**

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-3312

Attorneys for Defendant-Appellant

**ALEX HEMMER**
Deputy Solicitor General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5526
Alex.Hemmer@ilag.gov

Page

TABLE OF AUTHORITIES ........................................................................ iii

JURISDICTIONAL STATEMENT ............................................... 1

ISSUE PRESENTED ...................................................................... 3

STATEMENT OF THE CASE ....................................................... 4

    Legal Background ...................................................................... 4

    Procedural History ..................................................................... 6

SUMMARY OF ARGUMENT ...................................................... 10

ARGUMENT ................................................................................. 12

I.    This court reviews the legal issues *de novo*, while deferring to the district court's weighing of equitable factors. ............... 12

II.   Section 42 is not preempted by ERISA to the extent it requires staffing agencies to consider benefits in calculating compensation. ............................ 13

    A.    Section 42's benefits provision is not preempted by ERISA. ................. 14

    B.    The district court's contrary analysis is flawed. ..................................... 21

        1.    Section 42 is not distinguishable from the measures upheld in the total-compensation cases. ....................................... 21

        2.    Section 42 does not require employers to establish ERISA benefits plans. ................................................ 31

III.  The district court erred in enjoining the benefits provision. ............................ 36

    A.    Plaintiffs' asserted economic injuries do not warrant equitable relief. .. 36

    B.    The district court abused its discretion in balancing the equitable factors .................................................... 42

CONCLUSION .............................................................................. 46

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF RULE 30 COMPLIANCE

SHORT APPENDIX

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.C. by M.C. v. Metro. Sch. Dist. of Martinsville,*
75 F.4th 760 (7th Cir. 2023)............................................................................ 12

*Abbott v. Perez,*
585 U.S. 579 (2018) ........................................................................................ 44

*Aetna Health Inc. v. Davila,*
542 U.S. 200 (2004) ........................................................................................ 14

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.,*
840 F. Supp. 2d 327 (D.D.C. 2012) .................................................. 38, 39, 40, 42

*Amling v. Harrow Indus. LLC,*
943 F.3d 373 (7th Cir. 2019) ............................................................................. 2

*Bazile v. Fin. Sys. of Green Bay, Inc.,*
983 F.3d 274 (7th Cir. 2020) ............................................................................. 2

*Burgio & Campofelice, Inc. v. N.Y. State Dep't of Labor,*
107 F.3d 1000 (2d Cir. 1997)................................................................. 17, 19, 28

*Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.,*
519 U.S. 316 (1997) .....................................................................................passim

*Cassell v. Snyders,*
990 F.3d 539 (7th Cir. 2021) ................................................................. 13, 39, 43

*Cavel Int'l, Inc. v. Madigan,*
500 F.3d 544 (7th Cir. 2007) ............................................................. 38, 39, 40, 41

*Chamber of Com. of U.S. v. Edmondson,*
594 F.3d 742 (10th Cir. 2010) .......................................................................... 37

*Collins v. Ralston Purina Co.,*
147 F.3d 592 (7th Cir. 1998) ............................................................................ 34

*Concerned Home Care Providers, Inc. v. Cuomo,*
783 F.3d 77 (2d Cir. 2015)................................................................... 17, 19, 23

*Davis v. Pension Ben. Guar. Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) .................................................................... 37

*Doe v. Univ. of S. Indiana*,
43 F.4th 784 (7th Cir. 2022)......................................................................... 13, 36

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ........................................................................ 37

*Egelhoff v. Egelhoff*,
532 U.S. 141 (2001) ................................................................................ 25, 26

*ERISA Indus. Comm. v. City of Seattle*,
2020 WL 2307481 (W.D. Wash. May 8, 2020) .................................... 32

*ERISA Indus. Comm. v. City of Seattle*,
840 F. App'x 248 (9th Cir. 2021)............................................ 17, 19, 23

*Fort Halifax Packing Co. v. Coyne*,
482 U.S. 1 (1987) ............................................... 15, 22, 27, 31, 34, 35

*Frank Bros. v. Wis. Dep't of Transp.*,
409 F.3d 880 (7th Cir. 2005) ..................................................................... 20

*GEFT Outdoors, LLC v. City of Westfield*,
922 F.3d 357 (7th Cir. 2019) ...................................................................... 36, 43

*Golden Gate Rest. Ass'n v. City & Cnty. of San Fran.*,
512 F.3d 1112 (9th Cir. 2008)................................................................... 45

*Golden Gate Rest. Ass'n v. City & Cnty. of San Fran.*,
546 F.3d 639 (9th Cir. 2008) .......................................... 15, 17, 19, 23, 25, 30, 35

*Hawaiian Airlines, Inc. v. Norris*,
512 U.S. 246 (1994) ....................................................................................... 22

*Hess Newmark Owens Wolf, Inc. v. Owens*,
415 F.3d 630 (7th Cir. 2005) ...................................................................... 38

*Ill. Republican Party v. Pritzker*,
973 F.3d 760 (7th Cir. 2020) ..................................................................... 12

*Keystone Chapter, Associated Builders & Contractors, Inc. v. Foley*,
37 F.3d 945 (3d Cir. 1994)...............................17, 18, 19, 20, 21, 23, 27, 29, 30, 35

iv

*Laborers' Pension Fund v. Miscevic,*
    880 F.3d 927 (7th Cir. 2018) ............................................................ 16, 20

*Life Spine, Inc. v. Aegis Spine, Inc.,*
    8 F.4th 531 (7th Cir. 2021)........................................................................ 38

*Massachusetts v. Morash,*
    490 U.S. 107 (1989) ............................................................... 14, 20, 22

*McHenry Cnty. v. Raoul,*
    2022 WL 636643 (7th Cir. Jan. 12, 2022)............................................. 38

*McHugh v. Ill. Dep't of Transp.,*
    55 F.4th 529 (7th Cir. 2022)....................................................................... 1

*Merit Construction Alliance v. City of Quincy,*
    759 F.3d 122 (1st Cir. 2014)..................................................................... 26

*Minn. Chapter of Associated Builders & Contractors, Inc. v.*
    *Minn. Dep't of Lab. & Indus*, 47 F.3d 975 (8th Cir. 1995) ................ 17

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) ................................................................................. 39

*Nat'l Min. Ass'n v. Jackson,*
    768 F. Supp. 2d 34 (D.D.C. 2015) ....................................................... 37

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,*
    514 U.S. 645 (1995) ..................................................................... 15, 16, 17

*Retail Indus. Leaders Ass'n v. Fielder,*
    475 F.3d 180 (4th Cir. 2007) ........................................................... 24, 25

*Rutledge v. Pharm. Care Mgmt. Ass'n,*
    592 U.S. 80 (2020) ................................................... 15, 16, 20, 29, 30

*Save Jobs USA v. DHS,*
    105 F. Supp. 3d 108 (D.D.C. 2015) ................................................... 37

*Shaw v. Delta Air Lines, Inc.,*
    463 U.S. 85 (1983) ........................................................................... 16, 24

*Simas v. Quaker Fabric Corp. of Fall River,*
    6 F.3d 849 (1st Cir. 1993) ................................................. 34

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ........................................ 12, 36, 40, 41

*Wis. Dep't of Corr. v. Shacht,*
    524 U.S. 381 (1998) ......................................................... 1

*WSB Elec., Inc. v. Curry,*
    88 F.3d 788, 792 (9th Cir. 1996) .......................... 17, 19, 25

*Zessar v. Keith,*
    536 F.3d 788 (7th Cir. 2008) ............................................ 6

**Statutes, Regulations and Rules**

29 U.S.C.
    § 151 ............................................................................ 1
    § 186 ...................................................................... 31, 34
    § 1001 .......................................................................... 1
    § 1002 ........................................................ 31, 32, 33, 34
    § 1144 ........................................................................ 14

42 U.S.C. § 18001 ............................................................. 1

29 C.F.R. § 2510.3-1 ........................................................ 33

5 ILCS 100/5-45 ............................................................... 6

820 ILCS
    175/1 ........................................................................... 4
    175/2 ...................................................................... 4, 44
    175/11 ......................................................................... 7
    175/42 .................................................................*passim*
    175/67 ......................................................................... 7

Ill. Pub. Act No. 91-579 (1999) ........................................ 4

Ill. Pub. Act No. 103-437 (2023) ...................................... 5

Ill. Pub. Act No. 103-564 (2023) ...................................... 7

S.B. 3650, 103d Gen. Assemb. (Ill. 2024) ......................... 6

47 Ill. Reg.
  12,316 (Aug. 18, 2023)..........................................................................6
  12,457 (Aug. 18, 2023)..........................................................................6

**Other Authorities**

Nat'l Employment Law Project, *Temp Workers Demand Good Jobs* (2022),
  https://bit.ly/3QzSXOL. ..............................................................5, 44

Valenzuela Jr., Abel, *et al.*, UCLA Ctr. for the Study of Urban Poverty,
  *On the Corner: Day Labor in the United States* (2006),
  http://bit.ly/4dvTsTE.............................................................................4

# JURISDICTIONAL STATEMENT

Plaintiffs are three temporary staffing agencies — companies that employ individuals and assign them to work on a temporary basis for third-party clients — and two trade associations that represent such agencies. Doc. 1 ¶¶ 5-9.[1] They filed this action in November 2023 to challenge certain amendments to the Illinois Day and Temporary Labor Services Act ("Act"), which regulates the temporary staffing industry. Doc. 1. Plaintiffs alleged that two sections of the Act, as amended, were preempted by federal law — specifically, the Employee Retirement Income Security Act of 1974, or "ERISA," 29 U.S.C. §§ 1001 *et seq*.; the Affordable Care Act, 42 U.S.C. §§ 18001 *et seq*.; and the National Labor Relations Act, 29 U.S.C. §§ 151 *et seq*. Doc. 1 ¶¶ 68-89. Plaintiffs also alleged that a third section of the Act, as amended, violated the Due Process Clauses of the Fourteenth Amendment to the United States Constitution, and article I, section 2, of the Illinois Constitution. *Id*. ¶¶ 90-93.

To the extent that the Eleventh Amendment to the United States Constitution affects subject-matter jurisdiction, the district court lacked federal-question jurisdiction over plaintiffs' request for injunctive relief premised on a violation of the Illinois Constitution. *See McHugh v. Ill. Dep't of Transp.*, 55 F.4th 529, 532-34 (7th Cir. 2022) (Eleventh Amendment immunity is jurisdictional but can be waived); *see also Wis. Dep't of Corr. v. Shacht*, 524 U.S. 381, 391 (1998) (United States Supreme Court has "not decided" whether "Eleventh Amendment immunity is a matter of

---

[1] Entries on the district court's docket are cited "Doc." and the short appendix is cited "SA."

1

subject-matter jurisdiction").  The district court also lacked jurisdiction over certain other requests for relief made by plaintiffs, including plaintiffs' request that it enjoin non-parties, Doc. 1 ¶ 94, their request that it enjoin aspects of the statutory regime that do not apply to them, *id.* ¶ 46, and their request that it enjoin enforcement of an expired emergency rule, *id.* ¶ 94.  *See Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020) (standing is jurisdictional); *Amling v. Harrow Indus. LLC*, 943 F.3d 373, 377 (7th Cir. 2019) (ripeness is jurisdictional).  The district court otherwise had jurisdiction over the case under 28 U.S.C. § 1331 because multiple claims raised federal questions, and under 28 U.S.C. § 1367(a) because one claim alleged a violation of the Illinois Constitution.

On March 11, 2024, the district court entered an opinion granting in part plaintiffs' motion for a preliminary injunction, SA1, and on March 18, 2024, the court entered a preliminary-injunction order, SA23.  The Director filed a notice of appeal on March 25, 2024, Doc. 48, which was timely under 28 U.S.C. § 2107(a) and Federal Rule of Appellate Procedure 4(a)(1)(A) because it was filed within 30 days of the opinion and order being challenged on appeal.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1), because the appeal arises from an interlocutory order granting an injunction.

## ISSUE PRESENTED

Section 42 of the Act, as amended, requires temporary staffing agencies — companies that employ temporary workers and assign them to work for third-party businesses — to ensure that the total compensation they provide certain long-term temporary workers is equivalent to the total compensation that those agencies' third-party clients provide to comparable employees.

The issue presented is whether the district court erred in granting plaintiffs a preliminary injunction on their claim that section 42 is preempted by ERISA to the extent it defines total compensation to include "benefits."

## STATEMENT OF THE CASE

**Legal Background**

This case concerns state authority to regulate the market for day and temporary labor. The day labor market is "rife with violations of workers' rights." Valenzuela Jr. *et al.*, UCLA Ctr. for the Study of Urban Poverty, *On the Corner: Day Labor in the United States* i (2006).[2] Day and temporary laborers earn less than workers who are permanently employed, they are uniquely vulnerable to wage theft and other forms of abuse by their employers, and workplace injuries are common. *See id.* at i-iii.

Illinois has for over two decades regulated the day and temporary labor staffing industry to police these abuses. It enacted the Day and Temporary Labor Services Act (then called the Day Laborer Services Act) in 1999 to require staffing agencies — businesses that employ day and temporary laborers and assign them to work for third-party firms — to register with the Department of Labor, and to guarantee day laborers regular wage payments and other minimum standards of employment. *See* Pub. Act No. 91-579, §§ 10, 30, 45 (1999) (codified as amended at 820 ILCS 175/1 *et seq.*). The Act has been repeatedly amended since that date, and today establishes a comprehensive set of rules protecting the over 650,000 workers who perform day and temporary labor in Illinois. *See* 820 ILCS 175/2.

Notwithstanding the State's effort to guarantee basic protections to day and temporary laborers in Illinois, inequalities continue. A 2022 study conducted by the

---

[2] http://bit.ly/4dvTsTE.

National Employment Law Project concluded that 35% of temporary laborers had worked for the same third-party client for over a year, and almost 20% had worked for the same client for over two years.  *See* Nat'l Employment Law Project, *Temp Workers Demand Good Jobs* 13 (2022).[3]  These so-called "permatemp" workers are commonly paid less than workers who perform substantially the same duties for clients, but who are directly employed by them.  *Id.* at 5.

This case concerns amendments made by the General Assembly to the Act in 2023 to address this issue.  *See* Pub. Act No. 103-437 (2023).  The centerpiece of the amendments is section 42, which attempts to guarantee day and temporary laborers "equal pay for equal work."  820 ILCS 175/42.  Section 42 requires temporary staffing agencies to pay any temporary employee "who is assigned to work at a third party client for more than 90 calendar days" each year "not less than the rate of pay and equivalent benefits" as the "lowest paid" individuals who perform substantially the same work but are employed directly by the staffing agency's third-party client.  *Id.* The purpose of section 42 is to ensure that long-term temporary laborers who play substantially the same role at private firms as those firms' direct-hire employees perform are not disadvantaged — with depressed wages and benefits — solely because of their status as temporary laborers.

Section 42 expressly defines total compensation to include "benefits":  A long-term day or temporary laborer must "be paid" not only substantially the same *wages* as a direct-hire employee performing substantially similar work, but also "equivalent

---

[3] https://bit.ly/3QzSXOL.

*benefits*" as such a person.  820 ILCS 175/42 (emphasis added).  But a staffing agency

need not alter the actual benefits it provides its employees to comply with section 42.

Rather, the agency can comply by "pay[ing]" those employees "the hourly cash

equivalent of the actual cost [of] benefits."  *Id.*  To comply with section 42, in other

words, a staffing agency must ensure that the total compensation of any long-term

temporary laborer (*i.e.*, a temporary laborer assigned to the same client for over 90

days annually) — taking into account both wages and benefits — is no less than the

total compensation provided by the agency's client to its "lowest paid" employees

who perform substantially similar work.  *Id.*[4]

**Procedural History**

Plaintiffs are three Illinois temporary staffing agencies, which do business as

ClearStaff, AllStaff, and TempsNow, and two trade associations (the Staffing Services

Association of Illinois and the American Staffing Association) that represent such

agencies.  Doc. 1 ¶¶ 5-9.  Plaintiffs filed this case in November 2023 to challenge the

amendments to the Act, contending among other things that section 42 is preempted

---

[4]  The Department promulgated emergency rules to implement the Act's
amendments, *see* 47 Ill. Reg. 12,457 (Aug. 18, 2023), and also proposed permanent
rules, *see* 47 Ill. Reg. 12,316 (Aug. 18, 2023).  However, the emergency rules lapsed as
a matter of law, *see* 5 ILCS 100/5-45(c) (emergency rules are limited to 150 days in
duration), and the Department has not pursued permanent rules to implement
section 42 in light of this litigation.  More recently, the General Assembly passed
further amendments to the Act.  *See* S.B. 3650, 103d Gen. Assemb. (Ill. 2024).
Although the amendatory bill — which has not yet been signed by the Governor —
alters the way that staffing agencies and their clients can comply with section 42's
wages provision, it does not materially amend its benefits provision.  Accordingly, if
the bill is signed into law, it will not moot this appeal.  *See Zessar v. Keith*, 536 F.3d
788, 794 (7th Cir. 2008) (an amendment does not moot challenge to a statute if the
post-amendment version is "substantially similar" to the pre-amendment version).

by ERISA to the extent it requires staffing agencies to consider benefits when providing equal compensation to long-term temporary workers. *Id.* ¶¶ 68-75.[5] Plaintiffs also sought preliminary injunctive relief, contending that section 42 — which was to take effect on April 1, 2024, *see* Pub. Act No. 103-564, § 65 (2023) — would cause the staffing-agency plaintiffs to "incur compliance costs" and lose revenue as their third-party clients shifted away from temporary labor, "caus[ing] financial harm in an indeterminate amount." Doc. 23 at 25-27.

The district court held a hearing on plaintiffs' motion. During the hearing, representatives of ClearStaff, TempsNow, and AllStaff testified as to the anticipated effect of section 42 on their business. *See* Doc. 44. ClearStaff's general manager testified that it had experienced an 8% decrease in revenue comparing 2022 to 2023, which he attributed to section 42. *Id.* at 81:2-15, 84:10-19. But he agreed that data produced by plaintiff the American Staffing Association showed a nationwide 14.1% decline in the use of temporary labor from 2022 to 2023. *Id.* at 86:23-87:5; *see also* Doc. 53-3 (exhibit). TempsNow's owner testified that "10 to 15 percent" of its business would be "affected" by section 42, including clients that planned to shift

---

[5] Plaintiffs also challenged two other provisions added by the 2023 amendments: section 11, which requires staffing agencies to inform temporary laborers of labor disputes at job sites, and section 67, which permits certain private parties to enforce the Act. *See* Doc. 1 ¶¶ 83-93; 820 ILCS 175/11, /67. The district court declined to enjoin those provisions, concluding that plaintiffs' challenges to them were unlikely to succeed on the merits. SA11-17. Plaintiffs did not file a notice of cross-appeal, and so those aspects of the district court's decision are not at issue on appeal. Plaintiffs also alleged in the complaint that section 42 is preempted by the Affordable Care Act. Doc. 1 ¶¶ 76-82. But they did not seek or obtain preliminary injunctive relief on that claim, and so it, too, is not at issue on appeal.

from long-term to short-term temporary labor and clients that planned to hire temporary workers directly onto their payroll. Doc. 44 at 103:19-20, 110:1-7. And AllStaff's CEO testified that 15% of the company's clients had moved away from long-term temporary labor as a result of section 42, although she agreed that figure was not in her declaration and testified that she could not recall whether she had relied on business records or a financial model in estimating it. *Id.* at 54:18-20, 61:20-63:23.

The district court issued an opinion granting plaintiffs' motion for a preliminary injunction as to the provision of section 42 that requires staffing agencies to consider benefits in calculating compensation, and subsequently entered an order enjoining the Director from enforcing that provision. SA1-24. The court agreed that section 42 likely was preempted by ERISA to the extent it requires staffing agencies to consider benefits in providing equal compensation to long-term temporary workers. SA4-11. The court reasoned primarily that section 42's benefits provision "dictates the choices" facing the sponsors of ERISA-governed benefit plans (the staffing agencies), in that it requires agencies to consider benefits in calculating the minimum level of compensation they must provide long-term temporary workers. SA6. The court acknowledged that agencies could comply with section 42 simply by providing those workers with the cash value of comparable employees' benefits, but it dismissed that alternative as "too disruptive of uniform plan administration" to save the provision from preemption. *Id.* The court also reasoned that, in its view, section 42's benefits provision was likely preempted because it required staffing agencies to

8

establish and maintain an "ongoing administrative scheme involving individual judgments" as to employees' benefit eligibility, thus essentially requiring those agencies to establish a benefit plan governed by ERISA. SA8-9.

The court also concluded that plaintiffs were likely to suffer irreparable harm if section 42's benefits provision were enforced and that the equities weighed in favor of preliminary injunctive relief. SA17-22. The court agreed with plaintiffs that the compliance costs associated with section 42, standing alone, could constitute irreparable harm. SA18. And it found that each of the staffing-agency plaintiffs had already suffered or would suffer business losses due to section 42, ranging from an 8% to a 15% loss of revenue. SA19. Because plaintiffs would not be able to recover those damages from the State, the court held, they had "established more than a mere possibility of irreparable harm." SA20. The court finally held that the balance of the equities tipped in plaintiffs' favor. SA20-22. Although the court acknowledged that enjoining enforcement of the benefits provision might harm the public interest by invalidating "important protections for temporary workers," it reasoned that denying injunctive relief would work "substantial" harm on plaintiffs' businesses. SA21. In the end, the court found, because plaintiffs had "made a strong showing of likelihood of success on the merits, the balance of the equities does not need to weigh as heavily in their favor." *Id.* Accordingly, the court granted the motion in relevant part, SA22, and entered an injunction prohibiting the Department from enforcing section 42's benefits provision, SA23.

## SUMMARY OF ARGUMENT

The district court erred twice over in enjoining the enforcement of section 42 to the extent it requires temporary staffing agencies to consider benefits in ensuring that long-term temporary laborers are paid the same as direct-hire employees who perform substantially the same work.

First, the district court erred in concluding that section 42 is preempted by ERISA insofar as it requires the consideration of benefits. Every court of appeals to have considered the question has held that States may establish minimum levels of total compensation for workers — defined to include benefits — consistent with ERISA, as long as such measures can be satisfied by making unrestricted cash payments rather than by modifying ERISA-governed benefit plans. Section 42 falls easily within that line of caselaw, and so is not preempted by ERISA. The district court's contrary conclusion rests largely on perceived differences between the way that section 42 operates and the way that other laws operate, but the distinctions identified by the district court are irrelevant: A State can enact regulations of this sort outside the public-works context (as section 42 does), and a State may require employers to calculate workers' minimum level of compensation for themselves (as section 42 does) as long as it does not require or induce employers to change their ERISA benefit plans (as section 42 does not). Section 42 likewise does not require staffing agencies to establish ERISA benefit plans in the first instance, as the district court suggested, as it neither requires staffing agencies to offer benefits (as opposed to making unrestricted cash payments) nor requires them to create separate funds

for doing so.  In the end, section 42's cash-payment option is sufficient to remove the benefits provision from ERISA's scope, and the district court erred in concluding otherwise.

Second, the district court erred in concluding that plaintiffs were entitled to preliminary injunctive relief as an equitable matter.  Plaintiffs' sole argument as to their entitlement to an injunction is that they will face financial harm in the form of compliance costs and a reduction in revenues if the benefits provision were to take effect.  But economic harm generally does not warrant the extraordinary remedy of an injunction, and plaintiffs here failed to show that theirs is the kind of exceptional case — involving economic damages above and beyond a simple loss of profit — that would qualify.  Plaintiffs' testimony establishes at most that they may suffer a decrease in revenue of between 8% and 15% if the benefits provision were to take effect.  But such a reduction in revenue (and associated compliance costs) does not warrant injunctive relief, especially given plaintiffs' low likelihood of success on the merits and the demonstrated harms to Illinois temporary laborers that section 42 was intended to prevent.

## ARGUMENT

The district court erred in enjoining section 42 to the extent that it requires staffing agencies to consider benefits when compensating long-term temporary and day laborers at a rate equivalent to their third-party clients' comparable employees. Federal courts uniformly agree that States have the power to regulate wages by ensuring that total compensation for some or all workers must meet a specific level, and that States may require employers to consider benefits as part of total compensation without violating ERISA as long as employers can comply with such regulations by making direct cash payments to employees rather than altering their ERISA benefits plans. That basic rule resolves this case, and the district court erred in declining to follow it and instead enjoining section 42's benefits provision. This court should reverse the district court's decision and remand for further proceedings.

## I. This court reviews the legal issues *de novo*, while deferring to the district court's weighing of equitable factors.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff that seeks such a remedy "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* A mere "possibility" that a plaintiff may succeed after trial is insufficient; the plaintiff "must make a strong showing" that it will prevail. *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). Likelihood of success is "normally the most important" factor in deciding whether an injunction is required. *A.C. by M.C. v.*

*Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 771 (7th Cir. 2023).  If a plaintiff establishes both that it is likely to succeed on the merits and that it is likely to face irreparable harm absent injunctive relief, the court must "balance the competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief."  *Id.* at 774.

In reviewing a district court's decision to grant preliminary injunctive relief, this court applies a mixed standard of review, reviewing "the district court's findings of fact for clear error, its legal conclusions *de novo*, and its balancing of the factors for a preliminary injunction for abuse of discretion."  *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022).  An "error of law" is necessarily an abuse of discretion.  *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021).

## II.  Section 42 is not preempted by ERISA to the extent it requires staffing agencies to consider benefits in calculating compensation.

The district court made an "error of law," *Cassell*, 990 F.3d at 545, in concluding that section 42 is likely preempted by ERISA to the extent it requires staffing agencies to take account of benefits in calculating total compensation.  SA11.  This court reviews this legal question *de novo*, *Doe*, 43 F.4th at 791, and because plaintiffs must be likely to succeed on the merits to obtain preliminary injunctive relief, the court can vacate the injunction on this basis alone, *see id.* (declining to "address the remaining elements" of the test for injunctive relief where plaintiff was unlikely to succeed on the merits).  The court should do so here.  The federal courts of appeals have uniformly held that States can regulate wages by ensuring that total compensation for some or all workers meets or exceeds a specific level, and that

States may require employers to consider benefits as a part of total compensation without violating ERISA. That is exactly what section 42's benefits provision does, and the district court accordingly erred in enjoining its enforcement.

**A.      Section 42's benefits provision is not preempted by ERISA.**

This case concerns the State's authority to regulate worker compensation consistent with ERISA. ERISA was enacted in 1974 to "safeguard employees from the abuse and mismanagement of funds that had been accumulated to finance various types of employee benefits." *Massachusetts v. Morash*, 490 U.S. 107, 112 (1989). The statute achieved that end by establishing "elaborate provisions for the regulation of employee benefit plans," including "reporting and disclosure obligations for plans, . . . a fiduciary standard of care for plan administrators, and . . . schedules for the vesting and accrual of pension benefits." *Id.* at 113. At the same time, ERISA preempts state laws on those subjects, thus ensuring "a uniform regulatory regime over employee benefit plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004).

ERISA's preemption clause provides, as relevant here, that the provisions of that law "supersede any and all State laws insofar as they . . . relate to any employee benefit plan" governed by the statute. 29 U.S.C. § 1144(a). As the Supreme Court has explained, the text of ERISA's preemption provision is "unhelpful," in that many state statutes could be understood to "relate to" employee benefit plans in the broad sense. *Cal. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 324 (1997); *see also id.* at 335-36 (Scalia, J., concurring) ("[A]s many a curbstone philosopher has observed, everything is related to everything else."). The Court has

accordingly set out a two-part inquiry for courts to employ in determining whether a statute is preempted by ERISA: "[A] law 'relate[s] to' a covered employee benefit plan for purposes of [§ 1114(a)] if it [1] has a connection with or [2] reference to such a plan." *Id.* (majority opinion) (some quotation marks omitted).

Here, plaintiffs principally argued, and the district court agreed, that section 42's benefits provision was preempted by ERISA because it has a "connection with" employee benefit plans. SA5-11; Doc. 23 at 10-17.[6] Under that header, a state law may be preempted under ERISA even if it does not *expressly* reference benefit plans governed by that statute. *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995). Instead, a state law is preempted under this prong if it has the *effect* of rendering the regulation of employee benefit plans substantially disuniform, as with state "laws that require providers to structure benefit plans in particular ways, such as by requiring payment of specific benefits, or by binding plan administrators to specific rules for determining beneficiary status." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 87 (2020) (citation omitted). But the Supreme Court has cautioned that "not every state law" that merely "affects an ERISA plan or causes some disuniformity in plan administration" is preempted, *id.*;

---

[6] Plaintiffs also briefly argued that the benefits provision is preempted because it makes "reference to" ERISA plans. Doc. 23 at 17-18. The district court largely did not reach that question, *see* SA11 ("declin[ing] to consider whether the provision impermissibly references ERISA plans"), although its suggestion that the benefits provision in fact requires staffing agencies to *establish* ERISA benefit plans under *Fort Halifax* invokes caselaw that is sometimes read to fall under this prong of the preemption analysis. *See, e.g.*, *Golden Gate Rest. Ass'n v. City & Cnty. of San Fran.*, 546 F.3d 639, 648 (9th Cir. 2008). We address that aspect of the district court's opinion below. *See infra* pp. 31-36.

were it otherwise, "myriad state laws" would be rendered unenforceable by ERISA, *Travelers*, 514 U.S. at 668. Courts must look to "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive," *id.* at 656, in doing so asking "whether a state law 'governs a central matter of plan administration or interferes with nationally uniform plan administration,'" *Rutledge*, 592 U.S. at 87 (quoting *Gobeille v. Liberty Mutual Ins. Co.*, 577 U.S. 312, 320 (2016)).

Two specific principles distilled from these cases are relevant here. First, as the Supreme Court has explained, state statutes are unlikely to be preempted where they act "in fields of traditional state regulation." *Travelers*, 514 U.S. at 655; *see also Dillingham*, 519 U.S. at 330; *Laborers' Pension Fund v. Miscevic*, 880 F.3d 927, 931 (7th Cir. 2018). In a case implicating an area of traditional state regulation, courts thus work on the "assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Travelers*, 514 U.S. at 655. As this court has explained, a party urging preemption in such a context "bears a considerable burden" and "must overcome the starting presumption that Congress did not intend to supplant" state authority in such a field. *Laborers' Pension Fund*, 800 F.3d at 933-34 (cleaned up).

Second, state laws that do not "require[] employers to pay employees specific benefits," *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983), but instead "merely increase costs or alter incentives" regarding employee benefits, *Rutledge*, 592 U.S. at 88, are not preempted. So, for instance, the Supreme Court held in *Dillingham* that a state law requiring payment of a prevailing wage to certain apprentices on public

works projects was not preempted, even though it in practice encouraged employers to participate in a state-sponsored apprenticeship program, 519 U.S. at 331-32, and it held in *Travelers* that a state law requiring hospitals to collect fees from some private insurers but not others was not preempted, even though it in practice encouraged plan administrators to work with exempt insurers, 514 U.S. at 658-59.  In each case, although the laws had an "indirect economic influence" on how plan administrators structured worker benefits, they did not "bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself." *Dillingham*, 519 U.S. at 329; *accord Travelers*, 514 U.S. at 659.

Applying these standards, the federal courts of appeals have uniformly held that state laws and municipal ordinances that guarantee workers a minimum level of total compensation (including wages and benefits alike) are not preempted by ERISA as long as employers are able to satisfy those measures without altering their ERISA benefit plans.  *See, e.g.*, *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 87-90 (2d Cir. 2015); *Burgio & Campofelice, Inc. v. N.Y. State Dep't of Labor*, 107 F.3d 1000, 1007-10 (2d Cir. 1997); *WSB Elec., Inc. v. Curry*, 88 F.3d 788, 792-96 (9th Cir. 1996); *Minn. Chapter of Associated Builders & Contractors, Inc. v. Minn. Dep't of Lab. & Indus.*, 47 F.3d 975, 979-80 (8th Cir. 1995); *Keystone Chapter, Associated Builders & Contractors, Inc. v. Foley*, 37 F.3d 945, 960-62 (3d Cir. 1994); *see also Golden Gate*, 546 F.3d at 648-61 (same for ordinance designed to ensure minimum level of health benefit spending); *ERISA Indus. Comm. v. City of Seattle*, 840 F.

App'x 248, 249 (9th Cir. 2021) (per curiam) (same), *cert. denied*, 143 S. Ct. 443 (2022). The same rule dictates the same result here.

*Keystone Chapter* is emblematic. In that case, the Third Circuit considered whether Pennsylvania's prevailing-wage statute, which guaranteed certain workers the prevailing local minimum wage — defined to include "employer and employe[e] contributions for employe[e] benefits" — was preempted by ERISA. *See* 37 F.3d at 950. The statute required employers to pay employees a minimum cash wage and provide them a minimum level of benefits contributions, but allowed employers to pay "the monetary equivalent" of the benefits contributions directly to the employees as an alternative to increasing the benefits actually offered. *Id.* The district court held the law preempted, but the Third Circuit reversed. *Id.* at 953-54. As relevant here, the court held that the statute fell comfortably within the State's authority to "set a minimum cash wage" for certain workers. *Id.* at 961. It rejected the plaintiffs' argument that the statute was preempted by ERISA simply because it required employers to consider, and allowed them to alter, benefits to satisfy the minimum wage requirement. *Id.* at 960-61. "The provision," the court explained, "does not require or encourage an employer to provide certain benefits, to alter the manner in which it provides benefits, or even to provide any benefits at all." *Id.* at 960. "The benefits component," it went on, "only relates to ERISA plans when an employer decides to satisfy it through contributions to ERISA plans instead of cash payments or contributions to non-ERISA benefits." *Id.* "Where a legal requirement may be easily satisfied through means unconnected to ERISA plans," the court held, "and

only relates to ERISA plans at the election of an employer, it 'affect[s] employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan.'" *Id.* (quoting *Shaw*, 463 U.S. at 100 n.21).

Courts have unanimously followed *Keystone Chapter* in concluding that state statutes requiring employers in certain sectors to provide minimum compensation to employees — defined to include benefits — do not violate ERISA as long as employers can satisfy those laws with a non-ERISA alternative, like a cash payment. *Supra* pp. 17-18 (collecting cases). They have done so with respect to measures regulating wages in different sectors. *Compare, e.g.*, *Keystone Chapter*, 37 F.3d at 950 (public-works contractors), *and Burgio & Campofelice*, 107 F.3d at 1003 (same), *with Concerned Home Care Providers*, 783 F.3d at 81 (employers of home health aides), *and ERISA Indus. Comm.*, 840 F. App'x at 248 (hotel employers). They have done so with respect to measures that work differently — for instance, by allowing employers to satisfy their regulatory obligations by making cash payments to workers, *see Burgio & Campofelice*, 107 F.3d at 1003-04, or by having them pay into a government-run fund for that purpose, *see Golden Gate*, 546 F.3d at 643-46. In the end, these courts have held, laws like this are not preempted by ERISA as long as they do not "force employers to provide any particular employee benefits or plans, to alter their existing plans, or to even provide ERISA plans or employee benefits at all." *WSB Elec.*, 88 F.3d at 793.

Section 42 is materially indistinguishable from the statutes upheld in these cases. As in these cases, the General Assembly regulated in an area at the heartland

of state authority — worker compensation. *See Morash*, 490 U.S at 119 (explaining that the States "have traditionally regulated the payment of wages"); *Dillingham*, 519 U.S. at 330 (similar); *Frank Bros. v. Wis. Dep't of Transp.*, 409 F.3d 880, 886 (7th Cir. 2005) ("[T]he establishment of prevailing wage rates and labor standards for indigenous workers is an area of traditional state regulation."). Plaintiffs thus face the "considerable burden" of "overcom[ing] the starting presumption that Congress did not intend to supplant" state authority in such a field. *Laborers' Pension Fund*, 800 F.3d at 933-34 (cleaned up).

And as in the total-compensation cases, staffing agencies can comply with section 42 — including its benefits provision — in ways that do not require altering their ERISA-governed benefits plans, most notably by providing cash to their employees in the appropriate amount. *See* 820 ILCS 175/42 (agencies may pay long-term temporary laborers "the hourly cash equivalent of the actual cost [of] benefits" provided to comparable direct-hire employee). A staffing agency, in other words — just like a public-works contractor in *Keystone Chapter* or an employer of home health aides in *Concerned Home Care* — can satisfy its obligations under section 42 in a range of ways, only some of which touch on ERISA plans. Such an agency may satisfy section 42 "through contributions to ERISA plans," through "cash payments," or through "contributions to non-ERISA benefits." *Keystone Chapter*, 37 F.3d at 960. A law of that sort cannot be said to "govern[] a central matter of plan administration or interfere[] with nationally uniform plan administration,'" *Rutledge*, 592 U.S. at 87, and so is not preempted.

20

That basic rule resolves this case. Section 42 is not preempted by ERISA, because although it may have an "economic influence" on how employers structure worker benefits, it does not "bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself." *Dillingham*, 519 U.S. at 329. In the end, section 42 "does not require or encourage an employer to provide certain benefits, to alter the manner in which it provides benefits, or even to provide any benefits at all." *Keystone Chapter*, 37 F.3d at 960. Such a law falls easily within the State's power to regulate the wages of vulnerable workers, and is not preempted by ERISA.

## B. The district court's contrary analysis is flawed.

The district court reached a contrary conclusion, but its reasoning is flawed. The district court reasoned that section 42 is unlike the statutes upheld in the cases described above because it regulates businesses outside of the public-works context and because it imposes more administrative burdens on staffing agencies than these statutes. SA6-11. But those distinctions are wrong, irrelevant, or both. And the other reason the district court identified in holding section 42 preempted — that it requires staffing agencies to *establish* ERISA benefits plans — is incorrect as well, because section 42 does not require agencies to provide benefits or establish plans.

### 1. Section 42 is not distinguishable from the measures upheld in the total-compensation cases.

The district court acknowledged that courts have generally upheld statutes and local ordinances that ensure minimum levels of total compensation, including by reference to benefits. SA10; *see supra* pp. 17-18. The district court nonetheless held

that these cases were distinguishable on two separate grounds. The court erred on both fronts.

a. First, the district court reasoned that many of these cases concern States' regulation of "employees on public works projects" (that is, projects in which the State acts as contractor as well as regulator), which it viewed as "an area of traditional state regulation" warranting a presumption against preemption. SA10. But both the district court's understanding of state authority and its account of the caselaw are flawed. As the Supreme Court explained in *Morash*, "[t]he States have traditionally regulated the payment of *wages*," 490 U.S. at 119 (emphasis added), not merely the payment of wages to workers on public-works contracts. *Accord, e.g.*, *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994) ("employment standards" fall within the "traditional police power of the State," requiring presumption against preemption); *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987) (similar). Indeed, the Court in *Morash* applied a presumption against preemption in rejecting a broad understanding of ERISA preemption that would have called into question state regulation of wages outside the public-works context, explaining that such a position would have "far-reaching consequences." 490 U.S. at 119. States have traditionally regulated wages in all sectors, not merely in the public-works sector, and the district court accordingly erred in declining to apply a presumption against preemption.

As a consequence, the district court also erred in attributing the caselaw described above to the unique context of public-works projects. The fact that state prevailing-wage statutes arose first in the public-works context does not mean that

cases upholding such statutes turn on the application of a rule unique to that context. Indeed, as explained, *see supra* p. 19, in the last decade courts have rejected ERISA preemption challenges to statutes guaranteeing worker compensation in a variety of industries, including the home health aide industry, *see Concerned Home Care*, 783 F.3d at 81-82; the hotel industry, *see ERISA Indus. Comm.*, 840 F. App'x at 248; and, in *Golden Gate*, an ordinance that governed *all* private-sector employers of a certain size, *see* 546 F.3d at 643-45. And 30 years ago the Third Circuit dismissed outright an argument that the limited scope of Pennsylvania's prevailing-wage statute was relevant to ERISA preemption, explaining that "it is of no consequence that this requirement is particular to Pennsylvania public works projects" because "ERISA does not preempt a state's power to set a minimum cash wage." *Keystone Chapter*, 37 F.3d at 961. In the end, these cases rest on the basic rule that it does not violate ERISA to set a minimum level of compensation for workers — defined to include benefits — as long as such a measure can be satisfied with cash payments. *Supra* pp. 17-18. They do not rest on any principle unique to public-works projects.

b. The district court also reasoned that section 42 is distinguishable from the total-compensation cases because it requires "discretionary decision-making," which the court viewed as interfering with employers' management of employee benefits. SA10; *see also* SA6-8. In doing so, the court relied on a handful of cases for the rule that a state law that does not require plan administrators to alter ERISA benefits can nonetheless be preempted by ERISA if it is, as a functional matter, "too disruptive of uniform plan administration." SA6 (quoting *Retail Indus. Leaders*

*Ass'n v. Fielder*, 475 F.3d 180, 193 (4th Cir. 2007)). That argument is flawed on multiple levels.

At the threshold, the cases on which the district court relied do not set out a freewheeling rule under which a state law may be preempted by ERISA if it is "too disruptive" for employers. Rather, courts in these cases found state laws preempted because they in practice "requir[ed] employers to pay employees specific benefits" under an ERISA plan, *Shaw*, 463 U.S. at 97, or "b[ound] plan administrators to a[] particular choice" regarding ERISA plans, thus "function[ing] as a regulation of an ERISA plan itself," *Dillingham*, 519 U.S. at 329. The Fourth Circuit's decision in *Fielder*, on which the district court heavily relied, SA6-8, exemplifies that rule: The Maryland law at issue in that case applied only to one employer (Wal-Mart), and required it to "spend at least 8% of [its] total payroll[] on employees' health insurance costs or pay the amount [its] spending falls short to the State of Maryland." 475 F.3d at 183. Such a payment to the State would not yield any benefit for Wal-Mart or its employees; it functioned only as a penalty, intended to force the company to increase its spending on ERISA-regulated health benefits. As the Fourth Circuit explained, under the law, "the only rational choice" Wal-Mart had was to "structure [its] ERISA healthcare benefit plans so as to meet the minimum spending threshold." *Id.* at 193. The law thus "effectively require[d]" Wal-Mart "to establish a particular ERISA-governed benefit," *id.* at 192, and so was preempted.

Section 42's benefits provision does not have the same effect. Rather, as the courts that have approved of analogous measures have explained, section 42 does not

"force employers to provide any particular employee benefits or plans, to alter their existing plans, or to even [offer] ERISA plans or employee benefits at all." *WSB Elec.*, 88 F.3d at 793. The Ninth Circuit in *Golden Gate* — which considered a local ordinance that was (like the statute in *Fielder*) designed to encourage employers to increase their total healthcare spending — distinguished *Fielder* on that basis. *See* 546 F.3d at 660-61 (explaining that the ordinance at issue, "[i]n stark contrast to the Maryland law in *Fielder*, . . . offers employers a meaningful alternative that allows them to preserve the structure of their ERISA plans"). And the United States Department of Labor, which enforces ERISA, told the Supreme Court in 2022 that *Fielder* was an outlier, in that it established a regime with which Wal-Mart "could not comply . . . without modifying its ERISA plans." Brief for the United States as Amicus Curiae at 17, *ERISA Indus. Comm. v. City of Seattle*, 143 S. Ct. 443 (2022) (No. 21-1019) ("*ERIC* CVSG Br.").[7] By contrast, the Labor Department explained, regulatory regimes that employers can satisfy by making cash payments are not preempted because employers can comply "without making any modifications to their existing ERISA plans (or having an ERISA plan at all)." *Id.* at 13; *see also id.* at 9-10 (citing with approval total-compensation cases discussed above). Section 42 operates in exactly this manner, not (as the district court reasoned) in a manner analogous to the statute held invalid in *Fielder*.

The other cases on which the district court relied are farther afield than *Fielder*. The Supreme Court's decision in *Egelhoff v. Egelhoff*, 532 U.S. 141 (2001),

---

[7] https://bit.ly/3VlgHc7.

which the district court also cited for the proposition that a state law can be "too disruptive" to "avoid preemption," SA6, does not impose that rule. The state law at issue in *Egelhoff* "b[ound] ERISA plan administrators to a particular choice of rules," specifically by establishing a default rule that an individual's designation of a spouse as an asset's beneficiary would terminate upon divorce. 532 U.S. at 147. Although the statute allowed plan administrators to override the default by amending the plan, that option did not save it from preemption, the Supreme Court explained, because it simply meant that ERISA-governed plans would be altered either by operation of law (if the plan administrators did not override the default) or by active amendment (if they did). *See id.* at 150 ("The statute is not any less of a regulation of the terms of ERISA plans simply because there are two ways of complying with it."). By contrast, here staffing agencies need take no action at all with respect to ERISA plans. And the First Circuit's decision in *Merit Construction Alliance v. City of Quincy*, 759 F.3d 122 (1st Cir. 2014), which the district court also cited, SA7, has no bearing here at all: That case concerned an ordinance regulating private-sector apprenticeship programs, not the payment of benefits or their cash equivalent. *See id.* at 124; *see also, e.g.*, *ERIC* CVSG Br. 19-20 (distinguishing *Merit Construction* on this ground).

In the end, none of the cases cited by the district court holds (or even implies) that a statute requiring an employer to provide a minimum level of compensation to its employees — but permitting such an employer to satisfy that obligation entirely by making cash payments — might be preempted by ERISA simply because having to calculate and make such payments is "disruptive," SA10, to decisionmaking around

worker pay and benefits generally. To be sure, a state law may be preempted by ERISA if it is disruptive to an ERISA *plan*, in the sense that it effectively forces an ERISA plan administrator to change a plan's terms and conditions. Such a law "function[s] as a regulation of an ERISA plan itself," *Dillingham*, 519 U.S. at 329, and so is preempted. But a state law is not preempted if it makes it more challenging for employers to make decisions around worker pay and benefits generally. As the Third Circuit explained, ERISA aims "to ensure *benefit plans* will be governed by only a single set of regulations, not to bestow on employers a uniform regulatory and economic environment for all their activities across the country." *Keystone Chapter*, 37 F.3d at 960 (emphasis added; cleaned up); *accord Fort Halifax*, 482 U.S. at 8 ("ERISA's pre-emption provision does not refer to state laws relating to 'employee benefits,' but to state laws relating to 'employee benefit *plans*'" (emphasis in original)). State law pervasively regulates employee wages, working conditions, and more, and such laws frequently impose "administrative and financial burden[s]" on employers. *Keystone Chapter*, 37 F.3d at 960. But these burdens "arise[] from the 'patchwork scheme' of our federal system," and the laws imposing them are not "preempted by ERISA" simply because they make it more challenging to manage worker compensation. *Id.*

In any event, the district court was wrong that section 42's benefits provision is unique because it imposes "disruptive" rules on staffing agencies or requires them to engage in "discretionary decision-making" around benefits. SA6, 10. For one, all the statutes and ordinances in the total-compensation cases, *supra* pp. 17-18,

required "discretionary decisionmaking" by employers, too, in that each required employers to decide *how* to comply with the relevant rule — whether to "provide" the benefits in question "exclusively through ERISA plans, exclusively through non-ERISA plans, through additional cash wages, or though some combination of the three." *Burgio & Campofelice*, 107 F.3d at 1009. That is, although the district court faulted section 42 for requiring staffing agencies to "compare . . . their existing plans" to any benefits offered by their clients and "determine whether to modify or supplement their plans, calculate and pay the cost of any benefits they do not presently provide, or both," SA7, the same is true of all prevailing-wage measures, including those uniformly upheld by every court of appeals to have considered them. *Supra* pp. 17-18. That an employer has the "discretion" to decide whether to comply with such a regulation by changing its ERISA plan or not is what protects such a measure from preemption, not what makes it preempted.

To the extent the district court's contrary view rested in part on the fact that, in these cases, a government agency calculated the applicable prevailing wage levels, whereas section 42 requires the staffing agencies to do so using information supplied by third-party clients, *see* 820 ILCS 175/42, that is a distinction without a difference. The district court reasoned that section 42 imposes burdens on the staffing agencies at the calculation stage: Agencies must "identify employees that have worked more than 90 days at a particular client in the last year," analyze the "seniority and the similarity of work and working conditions" of employees at third-party clients to identify the appropriate comparators, and then "determine the value of benefits"

provided to the comparators and to the long-term temporary laborers in order to identify the appropriate minimum level of compensation.  SA8-9.

But any burdens associated with complying with this aspect of section 42 do not amount to interference with "nationally uniform plan administration." *Rutledge*, 592 U.S. at 87.  For one, "the bulk of administrative burdens placed on employers" by section 42 "do not relate to ERISA plans at all." *Keystone Chapter*, 37 F.3d at 962; *see supra* p. 27 (discussing this principle).  It may be burdensome, for instance, for the staffing agencies to identify the long-term temporary laborers to whom the act applies and the appropriate comparators at their third-party clients (as the district court posited, SA8-9), but any such burdens have no relationship to ERISA because they exist independently of whether a staffing agency (or its client) sponsors an ERISA benefit plan.  Indeed, staffing agencies are performing these administrative tasks at this very moment, given that section 42's equal-wages provision — which plaintiffs do not challenge, Doc. 44 at 122:22-123:1, and which the district court did not enjoin — requires those agencies to take the same steps to identify covered workers and their comparators as the law's benefits provision does, *see* 820 ILCS 175/42.  Whether such a task is cumbersome or not, it has nothing to do with ERISA, and the district court erred in relying on the burdens associated with it to find the benefits provision unduly disruptive to the administration of ERISA plans.

The same is true for the requirement that staffing agencies "determine the value of benefits" provided to direct-hire employees at their clients and use that value to determine the minimum level of compensation applicable to long-term temporary

workers. SA8-9. This requirement, too, "exist[s] whether or not a covered employer" — or, for that matter, a third-party client — "has an ERISA plan." *Golden Gate*, 546 F.3d at 657. A staffing agency, for instance, that does not sponsor an ERISA benefit plan for its employees must still provide comparable benefits or their cash equivalent to its long-term temporary workers, and an agency that does sponsor such a plan must provide such benefits to these workers even if the relevant third-party client does not sponsor an ERISA plan (for instance, by providing only fringe benefits that are not governed by ERISA to its employees). ERISA plans are thus not "essential to the [benefits provision]'s operation," *Dillingham*, 519 U.S. at 325; to the contrary, the provision is entirely agnostic as to their existence. The district court identified no way in which a provision like this could "function as a regulation of an ERISA plan itself," *id.* at 329, as the caselaw requires. In the end, because section 42 "does not require or encourage an employer to provide certain benefits, to alter the manner in which it provides benefits, or even to provide any benefits at all" in *meeting* the minimum level of compensation required by law, *Keystone Chapter*, 37 F.3d at 960, any administrative burdens it imposes on staffing agencies in *calculating* that level cannot interfere with "nationally uniform plan administration," *Rutledge*, 592 U.S. at 87.[8] The district court erred in concluding otherwise.

---

[8] Although any practical difficulty associated with calculating the value of employer-provided benefits (whether a staffing agency's or its client's) is not relevant to the preemption analysis, as discussed, many of plaintiffs' claims regarding the difficulty of doing so rest on misreadings of section 42. Plaintiffs suggested below, for instance, that calculating the value of benefits might turn on workers' "[p]erceptions as to the value of benefits," Doc. 23 at 5, or even "*why*" an individual worker "made a

## 2. Section 42 does not require employers to establish ERISA benefits plans.

The district court also identified a second reason that it believed section 42's benefits provision to be preempted by ERISA: The provision, in the court's view, requires staffing agencies to establish "an ongoing administrative scheme involving individual judgments," SA8, thus making it preempted under the Supreme Court's decision in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, and cases following it. That is not correct.

As relevant here, *Fort Halifax* considered whether a Maine statute requiring employers to provide certain severance payments was preempted because it required those employers to establish "employee welfare benefit plan[s]" governed by ERISA. *Id.* at 7-8. The Court agreed that the state statute in question required the provision of *benefits* covered by the text of ERISA, *see id.* at 7 & n.5 (citing 29 U.S.C. §§ 186(c), 1002(1)(B)), but it concluded that the statute was not preempted because it did not require employers to set up benefit *"plans,"* *id.* at 8 (emphasis in original). In doing so, the Court looked to both the statutory text, *see id.* at 7-8 (explaining that "the language of . . . ERISA presents a formidable obstacle" to the argument that a state statute was preempted) and to the Department of Labor's regulations interpreting that text, *id.* at 7 n.5. The same sources — the statutory text and the Department's regulations — dictate the same result here: Section 42's benefits provision does not

---

particular choice" regarding benefits, Doc. 38 at 4 (emphasis added). Nothing in the statute could plausibly be read to require an employer to conduct such an analysis.

require an employer to establish an "employee welfare benefit plan" within the meaning of ERISA.

To start, section 42 does not require employers to provide "benefits" at all. ERISA defines an "employee welfare benefit plan" as a "plan, fund, or program" that exists for the purpose of providing beneficiaries with any one of various benefits, including "medical, surgical, or hospital care or benefits, . . . benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits." 29 U.S.C. § 1002(1)(A). But section 42 does not require staffing agencies to provide any of these benefits to long-term temporary laborers; it simply establishes a minimum level of compensation, defined in part to include the value of any benefits provided by the agencies' clients, which employers may satisfy with cash payments. *See* 820 ILCS 175/42. Such payments are not "benefits," because workers can spend the cash however they choose; as in the total-compensation cases, "the direct payments need not be used for" ERISA-governed benefits "at all." *ERISA Indus. Comm. v. City of Seattle*, 2020 WL 2307481, at *4 n.5 (W.D. Wash. May 8, 2020), *aff'd*, 840 F. App'x 248. In the Labor Department's words, staffing agencies "do not establish or maintain an ERISA plan by making direct, unrestricted payments to employees" pursuant to section 42, "any more than they establish an ERISA plan by making direct payments of their employees' wages." *ERIC* CVSG Br. 7. Because section 42 does not require staffing agencies to provide their employers with "benefits," it does not require them to establish an employee welfare benefit plan, and is not preempted for that reason.

Section 42 also does not require an employer to establish an "employee welfare benefit plan" for a second reason:  The cash payments contemplated by the benefits provision can (and generally will) come from a staffing agency's general assets — not a separate fund — and so the provision does not require such an agency to establish a "plan" of the kind contemplated by ERISA and its implementing regulations.  The Supreme Court's opinion in *Dillingham* rests in part on this distinction:  The statute at issue there set up a regulatory scheme to govern apprenticeship programs, some of which are regulated by ERISA.  *See* 29 U.S.C. § 1002(1)(A) (defining "employee welfare benefit plan" to include a "plan" established or maintain for the purpose of providing beneficiaries with "apprenticeships or other training programs").  But the Supreme Court explained that the statute was not preempted because it could be satisfied by a program financed not "out of moneys placed into a separate fund," but rather "out of [an] employer's general assets" — a program that, accordingly, would not be an "ERISA plan."  519 U.S. at 326.  Such a distinction, the Court explained, followed from "ERISA's object and policy," namely to prevent "'the mismanagement of funds accumulated to finance employee benefits and the failure to pay employees benefits from accumulated funds.'"  *Id.* at 326-27 (quoting *Morash*, 490 U.S. at 115).  That distinction, the Court reasoned, was reflected in the Department's extensive regulations, each of which followed the "funded/unfunded distinction" — *i.e.*, in which a benefit program is not an "ERISA plan" if it is "paid for out of an employer's general assets."  *Id.* at 327 (citing sources); *see also, e.g.*, 29 C.F.R. § 2510.3-1(b)(2)-(3) (programs for payment of medical leave benefits, vacation benefits, and more are

not "employee welfare benefit plans" if paid for out of employer's "general assets").

Because section 42 can be satisfied by a staffing agency's payment of cash from its general assets, it does not require an agency to establish a "plan" within the meaning of ERISA, and so is not preempted.

*Fort Halifax* and its progeny do not alter that conclusion. *Fort Halifax* itself, as discussed, *supra* p. 31, held that a state law requiring certain employers to provide severance benefits to employees was *not* preempted because the statute did not require the employers to establish an ERISA benefit plan. 482 U.S. at 7. Although the Court distinguished the state law in question from a hypothetical statute that might require regulated entities to establish "an ongoing administrative program for processing claims and paying benefits," *id*. at 12, it did not hold that any state statute requiring the establishment of an "ongoing administrative program" regarding such benefits (much less regarding worker pay and benefits more generally) would be preempted. And although some courts have relied on this language to find state laws preempted when they require employers to establish benefits programs, *see, e.g.*, *Collins v. Ralston Purina Co.*, 147 F.3d 592, 596 (7th Cir. 1998); *Simas v. Quaker Fabric Corp. of Fall River*, 6 F.3d 849, 853 (1st Cir. 1993), those cases (like *Fort Halifax*) involve state laws requiring employers to offer severance payments, which ERISA expressly and categorically defines as a "benefit" regulated by the statute. *See* 29 U.S.C. §§ 186(c), 1002(1)(B); *Fort Halifax*, 482 U.S. at 7 n.5.[9] But no court of

---

[9] *Fort Halifax* assumed without deciding, based on two court of appeals opinions, that "a plan that pays severance benefits out of general assets is an ERISA plan."

appeals, to our knowledge, has ever applied *Fort Halifax* to hold that a state statute requiring unrestricted cash payments — payments not tied to any specific benefit governed by ERISA — is preempted simply because it imposes "administrative" or "discretionary" duties on such an employer.

Indeed, the district court's contrary reading of *Fort Halifax* would call into question States' authority to regulate worker compensation more broadly. Under the district court's reading of *Fort Halifax*, any state law that requires an employer to establish an "ongoing administrative scheme involving individual judgments," SA8, to calculate an employee's total compensation — defined to include benefits — is preempted by ERISA. But such a rule would, as discussed, call into question the many prevailing- and minimum-wage measures enacted by States and localities for decades, *supra* pp. 17-18 — a result that courts have uniformly rejected. *See, e.g.*, *Golden Gate*, 546 F.3d at 650-51 (rejecting argument that ordinance was preempted under *Fort Halifax* simply because it imposed "administrative obligations" on employers); *Keystone Chapter*, 37 F.3d at 959-60 (same). As the Third Circuit has explained, when States "enact their own wage and non-ERISA benefits regulations," employers also "must adjust their operations according to locale," but the ensuing "administrative and financial burden" does not mean that those laws are preempted

---

482 U.S. at 17-18. Those opinions are in serious tension with the Supreme Court's subsequent decision in *Dillingham*, which held that a state statute did not require the creation of an ERISA plan *because* the benefits in question could be funded out of general assets. *See supra* pp. 33-34; 519 U.S. at 326-28. But this court need not resolve that tension if it agrees that, as discussed, *Fort Halifax* applies only to state laws that require employers to provide severance payments (or, at a minimum, other benefits specifically and categorically governed by ERISA).

by ERISA. *Id.* at 960. The same is true here. The district court erred in concluding that section 42's benefits provision requires employers to establish an ERISA plan under *Fort Halifax*.

## III. The district court erred in enjoining the benefits provision.

The district court concluded that plaintiffs were likely to succeed on their ERISA preemption claim, SA11, but, as discussed, that is incorrect: Section 42's benefits provision is not preempted by ERISA because it can be satisfied by making unrestricted cash payments. That legal error alone warrants reversal. *See Doe*, 43 F.4th at 791 (no need to "address the remaining elements" of the test for injunctive relief if a plaintiff is unlikely to succeed on the merits). But the court should reverse the grant of injunctive relief for other reasons, too. To obtain the "extraordinary remedy" of a preliminary injunction, a plaintiff must show both that it is likely to suffer irreparable harm absent injunctive relief, *Winter*, 555 U.S. at 24, and that the balance of the equities weighs in its favor, *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). Here, the district court abused its discretion in holding that plaintiffs' asserted economic injuries — the costs of compliance and an anticipated loss of revenue — constituted irreparable harm, and that those harms exceeded the damage done to Illinois workers by an injunction.

### A. Plaintiffs' asserted economic injuries do not warrant equitable relief.

The district court erred in concluding that plaintiffs would suffer irreparable injury if section 42's benefits provision were enforced. SA17-20. The sole argument plaintiffs advanced below — and that the district court credited — was that plaintiffs

36

would experience economic harm if the benefits provision were to take effect pending trial. Specifically, plaintiffs argued — and the district court agreed — that (a) the costs of compliance with the benefits provision and (b) the anticipated revenue they would lose were the provision enforced constituted irreparable harm. Doc. 23 at 25-28; SA17-20. Neither of these asserted economic injuries warranted the entry of a preliminary injunction.

To start, the district court erred in failing to hold plaintiffs to their burden of showing that their asserted economic injuries were both likely and substantial. As a general matter, economic injuries do not constitute irreparable harm. *See East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) ("[E]conomic harm is not generally considered irreparable."); *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009) (similar). To be sure, courts recognize an exception for cases where — as here — sovereign immunity or some other barrier may prevent a litigant from ultimately recovering economic losses. *See East Bay*, 993 F.3d at 677; *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010). But because such an exception could threaten to "effectively eliminate" the irreparable-harm requirement in suits against the government, *Save Jobs USA v. DHS*, 105 F. Supp. 3d 108, 114 (D.D.C. 2015), courts generally hold plaintiffs relying on it to the "considerable burden of proving that [any] losses are *certain, great and actual*," *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52-53 (D.D.C. 2015) (cleaned up; emphasis in original). Such a movant must make "a strong showing that the economic loss would significantly damage its business above and beyond a simple diminution in

profits, or demonstrate[] that the loss would cause extreme hardship to the business, or even threaten destruction of the business." *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335-36 (D.D.C. 2012) (cleaned up). This court has applied essentially the same rule, granting injunctive relief where litigants show that their asserted economic injuries are likely to be "serious" or "substantial" — tantamount to "the uncompensated death of [a] business." *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 546 (7th Cir. 2007); *accord, e.g.*, *McHenry Cnty. v. Raoul*, 2022 WL 636643, at *1 (7th Cir. Jan. 12, 2022) (denying injunction where movant failed to show the loss of "substantial revenue").

The district court did not hold plaintiffs to that burden. Instead, the court reasoned that the economic injuries that plaintiffs asserted — the cost of complying with the benefits provision and the anticipated loss in revenue if it were enforced — constituted irreparable harm even though those injuries were "difficult to compute." SA18. But no case permits such a loose approach to ascertaining irreparable harm. *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531 (7th Cir. 2021), on which the district court relied, SA18-19, is inapposite: That case (and those like it) applies a rule under which a plaintiff that *can* ultimately recover damages from a defendant can still show irreparable harm if its economic injuries are "not fully identifiable" (because such injuries may not be quantifiable after judgment). *See Life Spine*, 8 F.4th at 546; *accord, e.g.*, *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005). It does not excuse a party attempting to establish irreparable injury from showing that its economic injuries will be severe, "above and beyond a simple

diminution in profits," *Air Transp. Ass'n*, 840 F. Supp. 2d at 336 — akin to "the uncompensated death of [a plaintiff's] business," *Cavel*, 500 F.3d at 546. The district court erred in applying a lesser standard to plaintiffs' motion for injunctive relief, thus necessarily abusing its discretion. *See Cassell*, 990 F.3d at 545 (an "error of law" is an abuse of discretion).

In any event, plaintiffs' irreparable harm arguments fall far short. Plaintiffs relied substantially on their assertion that the cost of complying with the benefits provision was "sufficient" standing alone "to establish irreparable harm," Doc. 23 at 25; *see* SA18 (agreeing), but the cases plaintiffs cited for that proposition say nothing of the sort. The Supreme Court did not hold in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), that a regulated entity suffers irreparable harm when it faces *any* compliance costs, as plaintiffs argued and the district court held. *See* Doc. 23 at 25; SA18. *Morales* holds only that a private party can bring a pre-enforcement suit under *Ex parte Young* to challenge a state law when state officials "ma[ke] clear that they would seek to enforce" the challenged law absent an injunction. 504 U.S. at 381. The Court's observation that the plaintiffs in that case might "suffer the injury of obeying the law during the pendency of the proceedings" if they did not file suit, *id.*, cannot reasonably be read (as the district court appeared to suggest, SA18) to hold that a plaintiff in such a case has always demonstrated irreparable harm. Indeed, a holding of that sort would essentially eliminate the irreparable-harm requirement in any case brought by a regulated entity to challenge a law imposing administrative costs. That cannot be right.

Plaintiffs otherwise did not show that either the cost of compliance with the benefits provision or their anticipated loss in revenue if it were enforced was "likely," *Winter*, 555 U.S. at 24, to lead to "the uncompensated death of [their] business[es]," *Cavel*, 500 F.3d at 546. The district court reasoned that plaintiffs would be required to "develop new administrative systems and processes and augment their human resources staff" to comply with section 42, SA18, but such administrative tasks are hardly likely to "threaten destruction of the business," *Air Transp. Ass'n*, 840 F. Supp. 2d at 336, even if they require a staffing agency to hire new employees. And although the district court credited one (but only one) staffing agency's assertion that it "cannot absorb" the cost of compliance, SA18, the court over-read the evidentiary record: That agency's owner stated in his declaration only that it could not "absorb both the loss in business *and* the additional expense and risk" created by section 42, Doc. 23-5 ¶ 39 (emphasis added), and explained at the hearing that his estimate assumed he would have to spend "$250,000 a year" employing a human resources specialist, Doc. 44 at 101:14, an estimate he did not substantiate in any way. In any event, no other plaintiff even attested that the cost of complying with the benefits provision would be economically catastrophic, which makes sense, given that the compliance costs described by the district court, SA18, largely parallel those imposed by section 42's equal-wages provision, which is now in effect (and with which the staffing-agency plaintiffs are presumably complying).

Finally, plaintiffs' claim that they would lose revenue were the benefits provision enforced, Doc. 23 at 26; *see* SA19, fares little better. The testimony that

the staffing-agency plaintiffs gave at the hearing established at most that between 8% and 15% of plaintiffs' third-party clients either had or had threatened to move away from long-term temporary labor due to section 42. *Supra* pp. 7-8; *see* Doc. 44 at 81:2-15, 84:10-19 (8% decrease in revenue attributable to section 42), 103:19-20, 110:1-7 (10 to 15% of business "affected by" section 42), 54:18-20, 61:20-63:23 (15% of clients had stopped doing business with plaintiff). But even taking that testimony at face value, a decrease in revenue of between 8% and 15% is not akin to "the uncompensated death of [a] business." *Cavel*, 500 F.3d at 546. Regulatory changes can be costly, but not every dip in revenue can warrant the "extraordinary remedy," *Winter*, 555 U.S. at 24, of a preliminary injunction. Were it otherwise, no change in the legal regime that could harm a plaintiff's business model could ever take effect pending trial.

And, as the district court acknowledged, SA19, there were reasons to doubt plaintiffs' account. The staffing-agency plaintiffs testified that between 8% and 15% of their clients either had or had threatened to move away from long-term temporary labor, *supra* pp. 7-8, but, as the Department explained, statistics produced by plaintiff the American Staffing Association showed a nationwide 14.1% decline in the use of temporary labor from 2022 to 2023. Doc. 44 at 86:23-87:5; *see also* Doc. 53-3 (exhibit). Those statistics raise a substantial question whether the staffing-agency plaintiffs' claimed decrease in revenue should actually be attributed to section 42, as opposed to the cyclical nature of the market for temporary labor. And plaintiffs' testimony was flawed in other respects. AllStaff's CEO testified that 15% of the

company's clients had stopped doing business with it — the highest of any of the staffing-agency plaintiffs' estimates, *supra* pp. 7-8 — but that figure was not in her declaration, she admitted she could not support it by reference to financial data or modeling, and AllStaff produced no documents to substantiate it. Doc. 44 at 61:20-63:23. And although TempsNow's owner stated that 10% to 15% of its business would be "affected by" section 42, he agreed that some of those clients would either shift to shorter-term temporary laborers (also from TempsNow) or hire TempsNow's workers on a full-time basis, either of which could or would yield additional revenue for the company. *Id.* at 104:4-19, 110:1-23.

The district court acknowledged some of these reasons to question plaintiffs' testimony, but dismissed them on the ground that the plaintiffs would, at minimum, "have to incur the costs of compliance or face the penalties of noncompliance." SA19. But it is not enough, as discussed, *supra* pp. 37-38, for a plaintiff to simply assert that it faces compliance costs; it must show that any such costs will "damage its business above and beyond a simple diminution in profits." *Air Transp. Ass'n*, 840 F. Supp. 2d at 336. Plaintiffs failed to make that showing, and further failed to show that any loss in revenue they might experience while the case proceeds will be sufficiently disabling to warrant the extraordinary remedy of injunctive relief. The district court erred in concluding otherwise.

**B.    The district court abused its discretion in balancing the equitable factors.**

Finally, even assuming plaintiffs showed irreparable harm, the district court abused its discretion in balancing the equitable factors. Once a movant shows a

likelihood of success and irreparable harm, a court must "weigh the harm that the [movant] will suffer absent an injunction against the harm to the defendant from an injunction, and consider whether an injunction is in the public interest." *GEFT Outdoors*, 922 F.3d at 364. In this circuit, courts employ a "sliding scale" approach, pursuant to which "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor," and "the less likely he is to win, the more need it weigh in his favor." *Cassell*, 990 F.3d at 545. The district court erred in applying these factors here.

As a threshold matter, the district court's balancing of the harms rests on the mistaken premise that plaintiffs were likely to succeed on their preemption claim, and should be set aside for that reason. The district court expressly acknowledged that its equitable judgment depended heavily on its view of the merits, explaining that, "because [p]laintiffs have made a strong showing of success on the merits, the balance of equities does not need to weigh as heavily in their favor." SA21; *see also* SA21-22 (reasoning that public interest did not favor enforcement of the statute because the public "does not have an interest in the enforcement of state laws that conflict with federal laws"). But plaintiffs' preemption claim is not likely to succeed, *supra* pp. 13-36, and so the district court's balancing of the equities rests on a flawed foundation. At minimum, if this court concludes that the merits question is a closer one than the district court believed, it follows from the court's own reasoning — *i.e.*, that the equities were relatively closely balanced — that the benefits provision should be allowed to take effect while the case proceeds.

In any event, even accepting the district court's view of the merits, it erred in enjoining the enforcement of the benefits provision. A State's "inability to enforce its duly enacted [statutes]" always "inflicts irreparable harm" on both the State and the public. *Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018). That harm is significant here because the benefits provision was designed for the purpose of protecting the State's over 650,000 day and temporary laborers, whom the General Assembly concluded are "particularly vulnerable to abuse of their labor rights." 820 ILCS 175/2. Indeed, as discussed, *supra* pp. 4-5, a substantial proportion — over a third — of purportedly temporary workers have in fact been working for the same third-party client for over a year, and almost 20% of those workers have been working for the same client for over *two* years. *See* Nat'l Employment Law Project, *Temp Workers Demand Good Jobs* 13 (2022).[10] Such workers suffer diminished pay and benefits: As the district court observed, 8% of long-term temporary workers receive retirement benefits, whereas 72% of American workers do. SA21. Hundreds of thousands of Illinois residents thus work on a long-term basis for businesses that do not treat them as employees, and are economically disadvantaged as a result. The General Assembly was right to find that such workers are "particularly vulnerable" to "abuse." 820 ILCS 175/2.

The district court abused its discretion in failing to weigh these harms to Illinois workers more substantially than the 8%-to-15% reduction in revenue (and associated compliance costs) described by plaintiffs. The court reasoned that these

---

[10] https://bit.ly/3QzSXOL.

financial costs are "substantial" and "significant," SA21, but it failed to seriously grapple with the ongoing financial costs that the day and temporary laborers whom section 42 is meant to protect now must continue to shoulder. As the Ninth Circuit explained in staying an injunction pending appeal in *Golden Gate*, "[f]aced with a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly in favor of the latter." *Golden Gate Rest. Ass'n v. City & Cnty. of San Fran.*, 512 F.3d 1112, 1126 (9th Cir. 2008) (cleaned up). The same is true here. The district court abused its discretion in overlooking that basic principle and enjoining the benefits provision based solely on plaintiffs' asserted financial injuries.

**CONCLUSION**

For these reasons, this court should reverse the decision below and vacate the

preliminary injunction.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

/s/ Alex Hemmer
**ALEX HEMMER**
Deputy Solicitor General
115 South LaSalle Street           115 South LaSalle Street
Chicago, Illinois 60603            Chicago, Illinois 60603
(312) 814-5526                     (312) 814-3312
Alex.Hemmer@ilag.gov

Attorneys for Defendant-Appellant

June 18, 2024

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(A) and Circuit Rule 32(c) because it contains 12,302 words (excluding the parts exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)). This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(a) because it has been prepared in a proportionally spaced typeface (12-point Century Schoolbook) using Microsoft Word.

/s/ Alex Hemmer
ALEX HEMMER

June 18, 2024

**CERTIFICATE OF RULE 30 COMPLIANCE**

In accordance with this Court's Rule 30(d), I certify that all materials required

by this Court's Rules 30(a) and (b) are included in the short appendix to the brief.

/s/ Alex Hemmer
ALEX HEMMER

June 18, 2024

# SHORT APPENDIX

## TABLE OF CONTENTS

Page

Memorandum Opinion and Order
     March 11, 2024 (Doc. 45) ................................................................... SA1

Preliminary Injunction Order
     March 18, 2024 (Doc. 46) ................................................................ SA23

UNITED STATES DISTRICT COURT<br>FOR THE NORTHERN DISTRICT OF ILLINOIS<br>EASTERN DIVISION

| | |
|---|---|
| STAFFING SERVICES ASSOCIATION OF ILLINOIS, AMERICAN STAFFING ASSOCIATION, CLEARSTAFF INC., M.M.D. INC. D/B/A THE ALLSTAFF GROUP, INC., TEMPSNOW EMPLOYMENT AND PLACEMENT SERVICES LLC,<br><br>    Plaintiffs,<br><br>  v.<br><br>JANE R. FLANAGAN, SOLELY IN HER CAPACITY AS THE DIRECTOR OF THE ILLINOIS DEPARTMENT OF LABOR,<br><br>    Defendant. | No. 23 C 16208<br><br>Judge Thomas M. Durkin |

## MEMORANDUM OPINION AND ORDER

Temporary staffing agencies and trade associations bring this action against the Director of the Illinois Department of Labor to enjoin the enforcement of several recently-passed amendments to the Illinois Day and Temporary Labor Services Act. For the following reasons, Plaintiffs' motion for a preliminary injunction, R. 21, is granted in part and denied in part.

## Background

On August 4, 2023, Governor JB Pritzker signed several amendments to the Illinois Day and Temporary Labor Services Act ("DTLSA") into law. The amendments are aimed at enhancing protections for the labor and employment rights of the more than 650,000 temporary workers in the State. *See* 820 ILCS 175/2. Those temporary workers are employed by temporary staffing agencies ("agencies") and sent to third-

1

party client work sites. Plaintiffs, which include two temporary staffing trade associations and three agencies, challenge three of the new provisions.

Section 42, titled "Equal pay for equal work," requires agencies to pay temporary employees who work at a particular site for more than ninety days within a year at least the same wages and "equivalent benefits" as the lowest paid, comparable, directly-hired employee employed by the third-party client.[1] 820 ILCS 175/42. Agencies may alternatively pay "the hourly cash equivalent of the actual cost benefits" in lieu of providing equivalent benefits. *Id.* Section 42 also requires third-party clients to provide agencies with "all necessary information related to job duties, pay, and benefits of directly hired employees" to allow agencies to comply. *Id.* In November 2023, the Illinois General Assembly passed, and the Governor signed, legislation delaying the effective date of Section 42 until April 1, 2024. Pub. Act 103-0564, Sec. 65.

Section 11, titled "Right to refuse assignment to a labor dispute," bars agencies from sending temporary employees to a place where a "strike, lockout, or other labor trouble exists" without first giving written notice of the "labor dispute" and the employees' "right to refuse the assignment without prejudice to receiving another assignment." 820 ILCS 175/11. Section 67 grants a private right of action to an "interested party," which is defined as "an organization that monitors or is attentive to compliance with public or worker safety laws, wage and hour requirements, or other statutory requirements." 820 ILCS 175/5, 67. "Interested parties" may seek

---

[1] Plaintiffs do not challenge the equal wages requirement of Section 42.

statutory penalties and injunctive relief. 820 ILCS 175/67, 70. Sections 11 and 67 are presently in effect.

Plaintiffs seek a preliminary injunction prohibiting the Illinois Department of Labor ("Department") from enforcing Sections 11, 42, and 67 and related regulations.[2] On February 7, 2024, the Court held a hearing on this motion and heard testimony from the three Plaintiff agencies.

## Legal Standard

A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Parties seeking such relief must establish (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of the equities tip in their favor; and (4) that an injunction is in the public interest. *Id.* at 20. This Court "must also bear in mind, when a party is seeking to enjoin a statute, that legislative enactments are entitled to a presumption of constitutionality." *Bevis v. City of Naperville, Ill.*, 85 F.4th 1175, 1188 (7th Cir. 2023).

## Discussion

I.   Likelihood of Success on the Merits

---

[2] The emergency rules that Plaintiffs seek to enjoin expired on January 4, 2024. 47 Ill. Reg. at 12,457–80. As such, the request to preliminarily enjoin the now-expired regulations is denied as moot. The Department also published proposed permanent rules in August 2023. *Id.* at 12,316–44. To the extent Plaintiffs seek to enjoin the proposed rules, that request is denied. *See Finch v. Treto*, 82 F.4th 572, 579 (affirming district court decision declining to enjoin proposed Illinois rule and noting that the proposal "was subject (and perhaps likely) to change before final adoption").

Plaintiffs argue that Sections 11 and 42 are preempted by federal statute and Section 67 violates due process. Although Plaintiffs need not demonstrate likelihood of success by a preponderance of the evidence, they must "make a 'strong' showing that reveals how they propose to prove their case." *Id.* (quoting *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020)). A mere possibility or "better than negligible" chance of success is not enough. *Id.* (citations omitted).

### A. Section 42

Section 42 requires agencies to pay temporary employees who work at a particular site for more than ninety days within a year either "equivalent benefits" as the lowest paid, comparable, directly-hired employee at the third-party client or "the hourly cash equivalent of the actual cost benefits." 820 ILCS 175/42. It also requires third-party clients to provide agencies with "all necessary information related to job duties, pay, and benefits of directly hired employees" so that agencies can comply. *Id.* As a preliminary matter, the fact that Plaintiffs have standing to challenge the obligations Section 42 imposes on them does not necessarily mean they have standing to challenge the obligations it imposes on their clients. *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("Standing is not dispensed in gross."). Plaintiffs do not offer any argument in reply about how they suffer "concrete, particularized, and actual or imminent" injury from the third-party disclosure obligations. R. 38 at 17 (the proposition that plaintiffs cannot vindicate third-party rights "may be accurate but [] is irrelevant"). Therefore, Plaintiffs do not have

4

**SA4**

standing to challenge that part of Section 42.[3] As such, for the purpose of this section and those that follow, "Section 42" refers only to the portion of that provision requiring agencies to pay "equivalent benefits" or the "cash equivalent."

Plaintiffs contend that Section 42 is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"). ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" covered by the statute. 29 U.S.C. § 1144(a). A state law "relates to" an ERISA plan "if it has a connection with or reference to such a plan." *Egelhoff v. Egelhoff*, 532 U.S. 141, 147 (2001). To determine whether a state law has an "impermissible connection" with an ERISA plan, courts look to ERISA's objectives "as a guide to the scope of the state law that Congress understood would survive." *California Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 325 (1997). With ERISA, "Congress sought 'to ensure that plans and plan sponsors would be subject to a uniform body of benefits law,' thereby 'minimiz[ing] the administrative and financial burden of complying with conflicting directives' and ensuring that plans do not have to tailor substantive benefits to the particularities of multiple jurisdictions." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020) (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990)).

In this way, ERISA is "primarily concerned with preempting laws that require providers to structure benefit plans in particular ways, such as by requiring payment

---

[3] The challenge to this part of Section 42 should come from the agencies' third-party clients.

5

**SA5**

of specific benefits, or by binding plan administrators to specific rules for determining beneficiary status" or if "acute, albeit indirect, economic effects of the state law force an ERISA plan to adopt a certain scheme of substantive coverage." *Id.* at 86–87 (cleaned up) (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983); *Egelhoff*, 532 U.S. 141; *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016)). ERISA also preempts state laws that provide "alternative enforcement mechanisms." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995). As a "shorthand" for these considerations, courts ask whether a state law "governs a central matter of plan administration or interferes with nationally uniform plan administration." *Rutledge*, 592 U.S. at 87 (citation omitted).

Plaintiffs have made a sufficiently strong showing that Section 42 fits the bill. The provision "dictates the choices facing ERISA plans." *Egelhoff*, 532 U.S. at 150 (quoting *Dillingham*, 519 U.S. at 334). Agencies must determine the value of many different benefit plans and then determine whether to provide the value in cash or the benefits themselves by modifying their plans or adopting new ones. Such a direct and inevitable link to ERISA plans warrants preemption.

The Department maintains that the cash alternative is Section 42's saving grace because it allows agencies a way of complying with the DTLSA without touching its ERISA plans. But "[e]ven if a state law provides a route by which ERISA plans can avoid the state law's requirements, taking that route might still be too disruptive of uniform plan administration to avoid preemption." *Retail Indus. Leaders Ass'n v. Fiedler*, 475 F.3d 180, 193 (4th Cir. 2007). *Egelhoff* is instructive on

6

this point. In that case, the Supreme Court held that ERISA preempted a state law requiring plan administrators to pay benefits to the beneficiaries chosen by the state law, rather than those identified in the plan documents, as provided by ERISA. *Egelhoff*, 532 U.S. at 147. Even though the state law had an opt-out provision, plan administrators would have to "maintain a familiarity with the laws of all 50 States so that they can update their plans as necessary to satisfy the opt-out requirements of other, similar statutes" and monitor the interpretation of those statutes by state courts. *Id.* at 151. Such "'tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction' [was] exactly the burden ERISA seeks to eliminate." *Id.* (quoting *Ingersoll-Rand*, 498 U.S. at 142).

The same applies here. Even with the choice between providing benefits or cash, Section 42 denies agencies the ability to administer its ERISA plans uniformly. For employees who work in Illinois, agencies have to collect and analyze benefit plan information from their client for a comparable employee, compare those plans to their existing plans, and determine whether to modify or supplement their plans, calculate and pay the cost of any benefits they do not presently provide, or both. Agencies also have to track how long each employee works at each client site. Agencies would not have to undertake any of these activities for their employees from other States. Relevant here, two Plaintiff agencies do business in Wisconsin. R. 44 ("Tr.") at 19, 98. "Such balkanization of benefit administration is exactly the sort of outcome ERISA was designed to prevent." *See Merit Const. All. v. City of Quincy*, 759 F.3d 122, 130 (1st Cir. 2014) (availability of "non-ERISA avenue to compliance" did not save

7

**SA7**

ordinance from ERISA preemption); *Fiedler*, 475 F.3d at 193 (state law requiring certain employers to spend percentage of their payrolls on employees' health insurance costs or pay the balance to the State was preempted by ERISA).

The cash alternative does not shield Section 42 from preemption for another reason too. Making the Section 42 choice necessarily requires an ongoing administrative scheme involving individual judgments. In *Fort Halifax Co., Inc. v. Coyne*, 482 U.S. 1, 12 (1987), the Supreme Court held that a state law requiring employers who terminated or relocated operations to pay a one-time, lump-sum payment to employees was not preempted by ERISA because it did not establish or require employers to maintain "an ongoing administrative program for processing claims and paying benefits." Applying this reasoning, in *Collins v. Ralston Purina Co.*, 147 F.3d 592, 595–97 (7th Cir. 1998), the Seventh Circuit found that a company's retention agreements providing payouts based on certain eligibility criteria implicated ERISA because they required "[p]rolonged individualized decision-making concerning benefits." *See also Simas v. Quaker Fabric Corp.*, 6 F.3d 849, 853 (1st Cir. 1993) (Massachusetts "tin parachute" statute requiring employers to pay severance benefits to employees who lost their jobs within two years of a corporate takeover was preempted by ERISA because it required "prolonged, individualized decisions" about eligibility).

Here, Section 42 requires agencies to make judgment calls about employees' eligibility and level of benefits on an individualized and ongoing basis. Initially, agencies must identify employees that have worked more than 90 days at a particular

8

**SA8**

client in the last year. Because that 90 days would include an employee's work for any number of agencies, and any number of clients, each agency has to collect data about each employee's historical work assignments and make an individualized determination of eligibility. Next, to identify the comparable employee at the client site, agencies must engage in qualitative assessments about seniority and the similarity of work and working conditions. *See* 820 ILCS 175/42. To provide "equivalent benefits," agencies must determine the value of the benefits given to a directly comparable employee and the value of the benefits given to its own employees. That appraisal is complex and particularized, as is the determination of how the benefits stack up to each other. For the cash alternative, agencies must calculate the "actual cost" of both sets of benefits, which can be computed in several ways, such as by taking into account a particular person's selections or using a formula based on metrics like headcount and hours of service. Deciding which method to use is inherently discretionary, and applying it is particularized to the benefits and employees involved. In short, by mandating "benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation," *Fort Halifax*, 482 U.S. at 11, Section 42 raises the very concern ERISA preemption seeks to address.

The Department casts Section 42 as a "state rate regulation[] that merely increase[s] costs or alter[s] incentives for ERISA plans without forcing plans to adopt any particular scheme of substantive coverage." *Rutledge*, 592 U.S. at 88 (citing *Travelers*, 514 U.S. at 668). But unlike the statutes in *Rutledge* and *Travelers*, Section

9

**SA9**

42 does not "merely affect[] costs." *Rutledge*, 592 U.S. at 87. It directly affects plan administration by requiring the consideration and analysis of individual plans in a way that impedes uniformity. And it does not just create "operational inefficiencies," *id.* at 91, but forces agencies to create an administrative scheme to conduct the ongoing, discretionary analysis required.

The Department's attempt to analogize Section 42 to prevailing wage and other statutes that have survived preemption fares no better. Prevailing wage statutes are similar to Section 42 in that they mandate a minimum wage—including a base pay component and a cash-equivalent benefits component—for employees on public works projects. *E.g.*, 820 ILCS 130/2. However, such statutes are afforded particular deference because public works projects are an area of traditional state regulation. *Dillingham*, 519 U.S. at 330 (applying presumption against ERISA preemption to California's prevailing wage statute). Such deference does not apply here. Additionally, prevailing wage statutes often come with a public schedule of wages that makes compliance far different from and less difficult than the discretionary and individualized determinations that Section 42 requires.

Similarly, the two other examples cited by the Department did not involve the discretionary decision-making required by Section 42. In *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 546 F.3d 639, 655–56 (9th Cir. 2008), the Ninth Circuit held that an ordinance requiring employers to make minimum healthcare payments on behalf of their employees did not have a "connection with" ERISA plans because employers could comply by contributing to an ERISA plan, paying the City, or a

10

combination of the two. But the employer's administrative burden was mere "mechanical record-keeping" and the payments to the City were fixed. *Id.* at 651. Likewise, in *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 89 (2d Cir. 2015), the Second Circuit held that a state law mandating a minimum rate of total compensation for home health aides was not preempted because employers could comply through any mix of wages and benefits that equaled or exceeded the specified minimum rate. While this case is somewhat closer, it is not binding on this Court and is factually distinguishable. Unlike the state law at issue in *Concerned Home*, Section 42 cannot "be easily satisfied through means unconnected to ERISA plans." *Id.* (citation omitted). As described, whether agencies choose to provide "equivalent benefits" or pay cash, they must analyze their own and third parties' ERISA plans and engage in ongoing, particularized, discretionary analysis to comply with Section 42.

As discussed previously, a state law "relates to" an ERISA plan, and is thus preempted, "if it has a connection with or reference to such a plan." *Egelhoff*, 532 U.S. at 147. Because the Court finds that Plaintiffs have made a strong showing that Section 42 has a "connection with" ERISA plans, the Court declines to consider whether the provision impermissibly references ERISA plans.

### B. Section 11

Section 11 prohibits agencies from sending temporary employees to a place where a "strike, lockout, or other labor trouble exists" without first giving written notice of the "labor dispute" and the "right to refuse the assignment without prejudice

to receiving another assignment." 820 ILCS 175/11. Plaintiffs argue that Section 11 is preempted by the National Labor Relations Act ("NLRA") under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959), or, alternatively, *Int'l Ass'n of Machinists and Aerospace Workers v. Wisconsin Emp't Relations Comm'n*, 427 U.S. 132 (1976).

1. *Garmon* Preemption

Under *Garmon*, States cannot regulate conduct that the NLRA protects, prohibits, or arguably protects or prohibits. *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776 (2023) (citing *Wisconsin Dept. of Industry v. Gould Inc.*, 475 U.S. 282, 286 (1986)). This form of preemption is rooted in the "determination that in enacting the NLRA Congress intended for the [NLRB] generally to exercise exclusive jurisdiction in this area." *Int'l Longshoremen's Ass'n, AFL–CIO v. Davis*, 476 U.S. 380, 391 (1986).

In deciding whether *Garmon* preemption applies, the first question is what conduct Section 11 regulates. On its face, it requires disclosure. Agencies must inform employees in writing that a labor dispute exists at a potential work site and that they have a right to refuse that assignment without prejudice to receiving another. 820 ILCS 175/11. Implicit in the latter part of the disclosure is a guarantee of an alternative work assignment. Altogether then, there are two activities regulated by Section 11: disclosure and work assignments.

Neither of those two activities is arguably protected by Section 7 of the NLRA. That section protects an employee's right to form, join, or assist labor organizations;

12

collectively bargain through a representative of the employee's choosing; engage in concerted activity, e.g., striking or picketing; or refrain from engaging in such activities. 29 U.S.C. § 157. It does not say or suggest anything about an employee's right to notice or an alternative work assignment. It also does not say or suggest anything about an employer's right to not give notice or an alternative work assignment. *Cf. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. C.M. Smillie Co.*, 139 Mich. App. 731, 734 (1984) ("advertising for strike replacements is not conduct prohibited by § 8 of the NLRA, nor is freedom from such advertising protected by § 7").

Plaintiffs argue that *Garmon* applies because Section 11 is "an anti-retaliation statute" and "[p]rotection against retaliation for supporting or refusing to support collective action is the essence of Section 7 of the NLRA." R. 38 at 12. But that "conclusory assertion" about the conduct Section 11 regulates and the conduct Section 7 protects is not enough. *Glacier*, 598 U.S. at 776 (quoting *Davis*, 476 U.S. at 394). The word "retaliate" does not appear in Section 11, and while Plaintiffs cite to the definition of "retaliate" in the now-expired emergency rules and proposed rules, neither is in effect.

Plaintiffs suing under Section 11 do not need to show that they declined their work assignment to support a strike or other collective action. Indeed, plaintiffs suing under Section 11 do not even need to show that they declined an assignment at all, so long as they did not receive the required written notice. *See* 820 ILCS 175/11(b) ("The failure by [an] agency to provide any of the information required by this Section

shall constitute a notice violation under Section 95."). That a Section 11 violation and an NLRA violation might hypothetically arise "in the same factual setting" does not mean Section 11 is pre-empted outright. *Cf. Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 197 (1978) ("The critical inquiry . . . is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not, presented to the Labor Board.").

Plaintiffs also argue that *Garmon* preemption applies because Section 11 creates new remedies for conduct arguably protected or prohibited by the NLRA. True, *Garmon* prevents States from "providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by" the NLRA. *Gould*, 475 U.S. at 286. But as stated, Plaintiffs have not shown that Section 11 regulates conduct arguably protected or prohibited by the NLRA, so they have not made a strong showing that *Garmon* preemption applies.

### 2. *Machinists* Preemption

*Machinists* preemption forbids States from regulating "conduct that Congress intended 'be unregulated because [it] left [the conduct] to be controlled by the free play of economic forces.'" *Chamber of Commerce v. Brown*, 554 U.S. 60, 65 (2008) (quoting *Machinists*, 427 U.S. at 140). It is based on the idea that "Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes." *Machinists*, 427 U.S. at 140.

14

Plaintiffs argue that Section 11 is preempted under *Machinists* because it regulates an "economic weapon" available to employers during strikes and lockouts: hiring replacement workers. Under federal labor law, employers are free to hire either temporary or permanent replacements. *520 Michigan Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 965 (7th Cir. 2006). In Plaintiffs' view, by requiring agencies to disclose the existence of strikes, lockouts, and other "labor disputes" at any client site where a temporary employee is assigned and issuing penalties for violations, the provision curtails those clients' ability to hire replacement workers when necessary.

But Section 11 does not bar employers from hiring replacement workers, or punish them for doing so. *Cf. id.* (*Machinists* preemption applied to state law that criminalized hiring of replacement workers). Nor does Section 11 prohibit temporary employees from accepting positions as replacement workers. It merely requires agencies to give their employees information about a potential work site and the right to an alternative assignment.

It is true that state laws with indirect effects on bargaining can be preempted under *Machinists*. *See Int'l Ass'n of Machinists Dist. Ten & Loc. Lodge 873 v. Allen*, 904 F.3d 490, 499-500 (7th Cir. 2018). But it is hardly a given that a Section 11 disclosure would discourage a temporary employee from taking a work assignment at an employer with an existing labor dispute. And Plaintiffs offer no evidence tending to suggest any effect of Section 11 on employers' ability to hire replacement workers. *Cf. Belknap, Inc. v. Hale*, 463 U.S. 491, 502 (1983) (holding that *Machinists* did not preempt replacement workers' breach of contract and fraudulent misrepresentation

15

**SA15**

claims and rejecting argument that such suits would "make it more difficult for the employer to hire replacements"); *see also Kapiolani Medical Center for Women and Children v. Hawaii*, 82 F. Supp. 2d 1151 (D. Haw. 2000), *order amended*, 103 F. Supp. 2d 1233 (D. Haw. 2000) (declining to declare preempted portion of state law requiring advertisements for replacement workers to disclose labor disputes where plaintiffs did not offer any evidence of interference with the right to hire replacement workers). Without more, Plaintiffs have not made a strong showing that *Machinists* preemption applies.

  C. Section 67

   Section 67 gives a private right of action to any "interested party," defined as "an organization that monitors or is attentive to compliance with public or worker safety laws, wage and hour requirements, or other statutory requirements." 820 ILCS 175/5, 67. Plaintiffs argue that Section 67 violates constitutional due process guarantees because there is no requirement that the "interested party" be injured by the complained-of violation.

   Plaintiffs point to cases where Illinois courts considered whether the state laws in question violated the Illinois Constitution by giving "interested" parties the right to sue. *See State ex rel. Leibowitz v. Family Vision Care*, LLC, 2020 IL 124754 ¶ 76 (qui tam statute allowing private right of action for "interested person[s]" did not "usurp the common-law powers of the attorney general"); *Winger v. Hradisky*, 2019 IL 123201 ¶ 37 (statutory provision exceeded the limits of substantive due process under the Illinois Constitution because it did not require any transactional

relationship between the parties for liability to attach). But as the Department correctly points out, Plaintiffs' claim arising under the Illinois Constitution against the Director in her official capacity is barred by sovereign immunity. *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 345 (7th Cir. 2020) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984)). Plaintiffs do not contest that argument in reply, and neither *Winger* nor *Family Vision Care* considered whether the state laws at issue ran afoul of federal due process.

While the parties spend much of the papers arguing about the extent to which Section 67 makes the DTLSA a qui tam statute, characterization is beside the point. Plaintiffs have not identified any case holding that a statute like this one, giving a private right of action to "interested parties," exceeds the limits of federal due process. That is likely because, in reality, Plaintiffs' argument is about standing, not due process. The Court cannot judge whether standing is proper in a future, hypothetical suit. If and when such a suit is filed, the court where it is pending can determine whether a supposed "interested party" has standing. Accordingly, Plaintiffs have not made a strong showing that federal due process bars Section 67.

## II. Irreparable Harm

With Plaintiffs' likelihood of success on the merits of their ERISA preemption challenge to Section 42, the Court considers whether they have shown irreparable harm. Harm is irreparable when "legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) "Inadequate 'does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared

to the harm suffered.'" *Id.* A mere possibility of irreparable harm will not suffice. *Nken v. Holder*, 556 U.S. 418, 434–35 (2009).

Plaintiffs have demonstrated more than a mere possibility of irreparable harm. To comply with Section 42, Plaintiffs will be forced to incur the expense and burden of determining the relevant values of benefits and creating, selecting, modifying, or supplementing existing ERISA plans or paying the difference. Plaintiffs anticipate having to develop new administrative systems and processes and augment their human resources staff to accomplish these tasks, the costs of which at least one agency cannot absorb. R. 23-2 ¶ 71; R. 23-3 ¶ 45; R. 23-5 ¶ 39; Tr. 52–53, 81, 100–01. If Plaintiffs do not or cannot comply, they face the threat of fines. *See* 820 ILCS 175/70. Such effects go beyond the minimal bookkeeping disruption that the Department suggests and constitute irreparable harm. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (holding that a plaintiff would suffer "irreparable harm" if forced to choose to incur either the civil enforcement liability of violating a preempted state law or the costs of complying with the law during the pendency of the proceedings); *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1334 (11th Cir. 2014) (affirming preliminary injunction in ERISA preemption case where "[a]bsent an injunction, [plaintiff's] members will be forced either to incur the costs of compliance with preempted state law or face the possibility of penalties").

Open questions about how agencies will ascertain and pay equivalent benefits or their actual cost makes the financial harm difficult to compute. But that difficulty only serves to support the irreparable nature of the harm. *See Life Spine*, 334 F.3d at

18

**SA18**

546 ("[I]t is precisely the difficulty of pinning down what business has been or will be loss that makes an injury 'irreparable.'"). In fact, Plaintiffs have already suffered business losses ahead of the law going into effect on April 1, 2024. ClearStaff, AllStaff, and TempsNow have each lost clients and revenue due to Section 42. Tr. 54–55, 62, 64–65, 78–79, 95, 101–06. ClearStaff is down 8% in revenue compared to the same period last year, with five clients who have stopped using the agency entirely accounting for approximately 100 employees and three clients who have transitioned to full-time employees or restricted assignments to less than 90 days. *Id.* 80–81, 95. The clients explained that they were ending temporary assignments because they did not want to share sensitive information with the agencies, as required by the law. *Id.* 79. AllStaff, for its part, has seen a 15% reduction of business that its clients have directly attributed to Section 42, specifically because they did not know how to comply with the statute, with approximately 85 employees without work. *Id.* 54, 64–65. And four out of TempsNow's 20 or so clients have either stopped doing business with the agency, stated that they will stop, or indicated that they will shift to hiring full-time employees or restricting assignments to less than 90 days. *Id.* 101–06.

The Department presented some evidence that there is a nationwide decline in temporary staffing, that agencies have alternative avenues for business like direct placement, and that agencies still make money for placements of less than 90 days. But such evidence does not negate the fact that agencies will have to incur the costs of compliance or face the penalties of noncompliance. *See Morales*, 504 U.S.at 381; *Hudgens*, 742 F.3d at 1334. Further, there is no way for Plaintiffs to recover these

costs or penalties in the event Section 42 is permanently enjoined. Sovereign immunity prevents Plaintiffs from seeking compensatory damages from the Department. *See Chamber of Commerce of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) (citing *Ohio Oil Co. v. Conway*, 279 U.S. 813, 814 (1929)) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury."); *see also Ind. Fine Wine & Spirits, LLC v. Cook*, 459 F. Supp. 3d 1157, 1170 (S.D. Ind. 2020); *Minerva Dairy, Inc. v. Brancel*, 2017 WL 3575710, at *1 (W.D. Wis. Aug. 18, 2017).

The Department argues that Plaintiffs have an adequate remedy at law because they can present their preemption argument as a defense in future civil suits or state enforcement actions. That does not resolve the inability to recover damages from the State. And the single Seventh Circuit case the Department cites for this proposition did not involve a pre-enforcement challenge. *See Buntrock v. S.E.C.*, 347 F.3d 995, 997 (7th Cir. 2003) (plaintiff "attempt[ed] to derail the SEC's suit [against him] by filing his own suit against the SEC rather than seeking relief in that suit"). With the costs of complying, potential penalties for not complying, business losses incurred thus far, and the inability to recoup losses, Plaintiffs have established more than a mere possibility of irreparable harm.

III.    Balance of the Equities

Since Plaintiffs have shown a likelihood of success on the merits and irreparable harm, the Court weighs the harm of denying an injunction to Plaintiffs against the harm to the Department of granting one. *Life Spine*, 8 F.4th at 539. In

20

**SA20**

balancing the harms, the Court also considers the public interest. *Id.* This test is done on a "sliding scale": if Plaintiffs are more likely to win on the merits, the balance of the harms need not weigh as heavily in their favor. *Id.*

Here, because Plaintiffs have made a strong showing of likelihood of success on the merits, the balance of equities does not need to weigh as heavily in their favor. As previously discussed, the harm to Plaintiffs of denying the injunction is substantial. Plaintiffs are poised to incur significant costs of compliance and face the possibility of penalties if they do not or cannot comply. As to the public interest, Plaintiffs point to the potential departure of agencies from Illinois if Section 42 goes into effect and the accompanying loss of job opportunities for the hundreds of thousands of temporary workers they employ.

The Department argues that granting the injunction harms both its and the public's interests because Section 42 creates important protections for temporary workers who "are particularly vulnerable to abuse of their labor rights." 820 ILCS 175/2. The Department cites the practice of "permatemping," or hiring temporary workers long term without paying them the wages and benefits they would be entitled to if hired directly. A 2022 report found that more than a third of temporary workers surveyed had been in their current assignment for over a year, and 8% of those workers received a retirement benefit compared with 72% of American workers overall. *See* R. 32 at 29 (citing National Employment Law Project report). But the Court must balance the public interest represented by the Department with the public interest represented by the Supremacy Clause and Congress' decision to

21

ensure the uniformity of law related to ERISA plans. *See Am. Trucking Ass'n v. City of Los Angeles*, 559 F.3d 1046, 1059–60 (9th Cir. 2009); *Professional Towing & Recovery Operators of Ill. v. Box*, 2008 WL 5211192, at *14 (N.D. Ill. Dec. 11. 2008) (The public "does not have an interest in the enforcement of state laws that conflict with federal laws."). In view of these considerations, the Court concludes that the balance of equities tips in Plaintiffs' favor.

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part Plaintiffs' motion for a preliminary injunction. The parties are to jointly submit a proposed preliminary injunction order consistent with this opinion to the Court's proposed order inbox by or before March 15, 2024.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: March 11, 2024

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Staffing Services Association of Illinois; American Staffing Association; ClearStaff Inc.; M.M.D. Inc. d/b/a The AllStaff Group, Inc.; TempsNow Employment and Placement Services LLC, | Case No. 1:23-cv-16208 |
| Plaintiffs, | Hon. Thomas M. Durkin |
| v. | |
| Jane R. Flanagan, solely in her capacity as the Director of the Illinois Department of Labor, | |
| Defendant. | |

**PRELIMINARY INJUNCTION ORDER**

For the reasons stated in the Court's Order dated March 11, 2024 (ECF #45), which the parties agree do not need to be restated in this Order, the relief requested in the Motion for Preliminary Injunctive Relief filed by Plaintiffs Staffing Services Association of Illinois, American Staffing Association, ClearStaff Inc., M.M.D. Inc. d/b/a The AllStaff Group, Inc., and TempsNow Employment and Placement Services LLC (ECF #21) is granted in accordance with the following terms.

Defendant Jane R. Flanagan, solely in her official capacity as the Director of the Illinois Department of Labor, is preliminarily enjoined from taking any actions to enforce the provisions of Section 42 of the Act requiring day and temporary labor service agencies, as defined by 820 ILCS 175/5, to pay or provide the "equivalent benefits" or "the hourly cash equivalent of the actual cost [sic] benefits," referred to herein as the "Benefits Provisions," to any natural person who contracts for employment with a person or entity engaged in the business of employing day or temporary laborers to provide services, for a fee, to or for any third party client pursuant to a contract with the day and temporary labor service agency and the third party client. Actions

**SA23**

enjoined by this Order include enforcement actions and civil actions. Enjoined actions also include issuing any right to sue letter related to an allegation of a violation of the Benefit Provisions and the sending of any "notice of complaint to the named parties alleged to have violated this Act" pursuant to Section 67(a)(2) (825 ILCS 175/67(a)(2) & (b)) of the Act if the complaint in question alleges a violation of the Benefits Provisions, which the parties agree is a condition precedent to an interested party commencing a civil action alleging a violation of the Benefit Provisions without a right to sue letter.

Plaintiffs are not required to give security.

Dated: March 18, 2024

_Thomas M Durkin_
_____
Hon. Thomas M. Durkin
United States District Judge

2

**SA24**

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on June 18, 2024, I electronically filed this brief and short appendix with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system.

All participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Alex Hemmer
ALEX HEMMER